IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DIS
EASTERN DI

23-cv-15145
Judge Pallmeyer
Magistrate Judge McShain
Direct Assignment

[SUPPRESSED],

Plaintiff/Relator,

v.

[SUPPRESSED],

Defendant.

JURY TRIAL DEMANDED

FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730

DO NOT PLACE ON PACER
DO NOT PLACE IN PRESS BOX

**RELATOR'S COMPLAINT**
**PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729, *ET SEQ.***

FILED
OCT 19 2023 JC
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES *ex rel.* MARK PANNEK, | ) | Case No.________________ |
| | ) | |
| Plaintiff/Relator, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | **FILED IN CAMERA AND** |
| | ) | **UNDER SEAL PURSUANT** |
| ARCHER DANIELS MIDLAND COMPANY, | ) | **TO 31 U.S.C. § 3730** |
| | ) | |
| Defendant. | ) | **DO NOT PLACE ON PACER** |
| | ) | **DO NOT PLACE IN PRESS BOX** |

**RELATOR'S COMPLAINT**
**<u>PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729, *ET SEQ.*</u>**

The United States of America by and through *qui tam* Relator Mark Pannek ("Relator" or "Mr. Pannek") and his designated counsel, bring this action under 31 U.S.C. § 3729 *et seq.,* as amended, to recover all damages, penalties, attorneys' fees, and other remedies established by the False Claims Act. Relators seek to recover, on behalf of the United States, proceeds obtained and retained by Defendants (identified in Section III) from claims submitted for payment to the United States in violation of the False Claims Act, 31 U.S.C.§ 3729, *et seq.*, as amended by the Fraud Enforcement and Recovery Act of 2009, 123 Stat. 1617, *et seq.*

## I. INTRODUCTION/SUMMARY OF ALLEGATIONS

1. Archer Daniels Midland (ADM) is one of the world's largest companies and most prolific government contractors. It has solicited and obtained at least 360 government contacts and several grants without having in place sufficient process for complying with critical and material cybersecurity safeguards required by those contracts. After being awarded these contracts, it sought and received payment under them without disclosing to the government that it had failed to put in place the required measures to protect highly sensitive electronic data. As a result, ADM

made claims for payment under contracts it knew it was not qualified to obtain, and for amounts reflecting performance that it did not deliver, all in violation of the federal False Claims Act.

2. This Complaint details the specific contracts at issue, the cybersecurity requirements mandated, the type of information that was left unprotected and the manner in which the information was compromised. Plaintiff-Relator Mark Pannek is the source of these allegations. He was ADM's director of global data governance, risk and compliance. He personally audited ADM's compliance with cybersecurity requirements and alerted the company to the material deficiencies described below. The company did not empower him to cure the problems or disclose his internal audit results and material deficiencies to the government.

3. ADM operates in almost every country in the world. Its contracts with the government serve critical government functions. Those functions include providing and transporting food and food related products to: (1) the United States military in aid of the United States' defense operations, (2) other countries in aid of the United States' strategic and humanitarian objectives, and (3) school children in aid of the health of our population at home. In the course of performing these contracts, ADM compiles a massive amount of material and confidential information, including but not limited to personal identification information. For example, ADM databases contain the names, addresses, banking information, taxpayer identification information for thousands of farmers and other subcontractors who provide food and food related products required under the government contracts. ADM databases identify specific locations throughout the world where it ships food and commodities in service of governmental objectives, as well as the dates of those shipments. ADM databases contain the transportation routes by which it delivers products to government-designated locations around the world.

4. The type of information identified in paragraph 3 above is precisely the type of information which the applicable government contracts require ADM to protect through cybersecurity measures. Those requirements are contained in a host of Federal Acquisition Regulations, 48 C.F.R. Parts 1-53 (“**FAR**”) requirements and summarized in the *United States Department of Agriculture (“USDA”) Contracting Deskbook*. Some of the key requirements are as follows.

> (a) *Definitions*. As used in this clause—
>
> *Covered contractor information system* means an information system that is owned or operated by a contractor that processes, stores, or transmits Federal contract information.
>
> *Federal contract information* means information, not intended for public release, that is provided by or generated for the Government under a contract to develop or deliver a product or service to the Government, but not including information provided by the Government to the public (such as on public websites) or simple transactional information, such as necessary to process payments.
>
> *Information* means any communication or representation of knowledge such as facts, data, or opinions, in any medium or form, including textual, numerical, graphic, cartographic, narrative, or audiovisual (Committee on National Security Systems Instruction (CNSSI) 4009).
>
> *Information system* means a discrete set of information resources organized for the collection, processing, maintenance, use, sharing, dissemination, or disposition of information (44 U.S.C. 3502).
>
> *Safeguarding* means measures or controls that are prescribed to protect information systems.
>
> (b) Safeguarding requirements and procedures.
>
> (1) The Contractor shall apply the following basic safeguarding requirements and procedures to protect covered contractor information systems. Requirements and procedures for basic safeguarding of covered contractor information systems shall include, at a minimum, the following security controls:
>
> (i) Limit information system access to authorized users, processes acting on behalf of authorized users, or devices (including other information systems).

(ii) Limit information system access to the types of transactions and functions that authorized users are permitted to execute.

(iii) Verify and control/limit connections to and use of external information systems.

(iv) Control information posted or processed on publicly accessible information systems.

(v) Identify information system users, processes acting on behalf of users, or devices.

(vi) Authenticate (or verify) the identities of those users, processes, or devices, as a prerequisite to allowing access to organizational information systems.

(vii) Sanitize or destroy information system media containing Federal Contract Information before disposal or release for reuse.

(viii) Limit physical access to organizational information systems, equipment, and the respective operating environments to authorized individuals.

(ix) Escort visitors and monitor visitor activity; maintain audit logs of physical access; and control and manage physical access devices.

(x) Monitor, control, and protect organizational communications (*i.e.*, information transmitted or received by organizational information systems) at the external boundaries and key internal boundaries of the information systems.

(xi) Implement subnetworks for publicly accessible system components that are physically or logically separated from internal networks.

(xii) Identify, report, and correct information and information system flaws in a timely manner.

(xiii) Provide protection from malicious code at appropriate locations within organizational information systems.

(xiv) Update malicious code protection mechanisms when new releases are available.

(xv) Perform periodic scans of the information system and real-time scans of files from external sources as files are downloaded, opened, or executed.

> (2) *Other requirements.* This clause does not relieve the Contractor of any other specific safeguarding requirements specified by Federal agencies and departments relating to covered contractor information systems generally or other Federal safeguarding requirements for controlled unclassified information (CUI) as established by Executive Order 13556.
>
> (c) *Subcontracts.* The Contractor shall include the substance of this clause, including this paragraph (c), in subcontracts under this contract (including subcontracts for the acquisition of commercial products or commercial services, other than commercially available off-the-shelf items), in which the subcontractor may have Federal contract information residing in or transiting through its information system.

In particular, the USDA contracting deskbook requires government contractors such as ADM to limit access to federal contract information as follows:

> Personnel must be either U.S. citizens or Lawful Permanent Residents, also known as "green card" holders, in order to access: 1. USDA Mission Areas, Agencies and Staff Offices or controlled facilities; or 2. Information Technology (IT) systems or security items or products. This includes federal employees, contractors, subcontractors, experts, consultants, and paid/unpaid interns hired for work within the United States or its territories. Contractors must identify in their proposals the names and citizenship of all non-U.S. citizens proposed to work under the contract. Any additions or deletions of non-U.S. citizens after contract award must be reported to the Contracting Officer (CO) or Contracting Officer's Representative (COR).

5. As described in more detail below, ADM has not come close to satisfying these requirements. Despite being one of the largest and most well-resourced companies in the world, it has not made a serious effort to protect information in the manner required of a government contractor. Just by way of example, various databases containing PII and the other types of federal contract information described have come into the possession of ADM by virtue of corporate acquisition. Those databases have simply been dumped into a "datalake"—simply one big compilation of databases, access to which is materially unregulated by ADM. The company could not even accurately disclose all of what is contained in the datalake, the ingress and egress of data, nor who has access to it, much less assure that such access is limited to US Citizens or Lawful Permanent Residents as required under law. ADM does not effectively manage accurate and

necessary records of Data Transfers, Third Party Providers, and Servers. Moreover, despite public statements by ADM's CISO that ADM has no servers in China, Mr. Pannek discovered at least 52 servers in China, many of which contain significant PII.

6. Not only did ADM fail to meet these critical requirements, it knew at the time it made its bid for the contracts that it had not arranged for the cybersecurity capability to satisfy the requirements, and it had no plan to do so. After being awarded the contracts, not only did it knowingly fail to satisfy the specific requirements referenced above, it also failed to disclose those failures to anyone within the government. Instead, it solicited and received payment on the contract, knowing its performance was materially defective. Its failures are neither hyper-technical or innocent mistakes. They are brazen failures resulting from gross recklessness and/or willful indifference.

## II. PRELIMINARY STATEMENT

7. "It is the policy of the United States to ensure that our Nation's food and agriculture sector is secure and resilient in response to the possibility of high-consequence and catastrophic incidents. To achieve this, the Federal Government will identify and assess threats, vulnerabilities, and impacts … including but not limited to those presented by … cybersecurity."[1]

8. United States government contracts are subject to Federal Acquisition Regulations, 48 C.F.R. Parts 1-53 ("**FAR**"), as well as the agency-specific FAR regulations. Both United States government contracts and grants are subject to the Federal Information Security Management Act,

---

1 The White House, National Security Memorandum on Strengthening the Security and Resilience of United States Food and Agriculture (Nov. 10, 2022), https://www.whitehouse.gov/briefing-room/presidential-actions/2022/11/10/national-security-memorandum-on-on-strengthening-the-security-and-resilience-of-united-states-food-and-agriculture/. *See also* Executive Order 14028 (May 12, 2021), published in 86 Fed. Reg. 26633 (May 17, 2021).

44 U.S.C. 3541 *et seq.* ("**FISMA**"). When Congress passed FISMA (the Federal Information Security Management Act) in 2002, the National Institute of Standards and Technology ("**NIST**") was tasked with developing mandatory cybersecurity standards for federal agencies. To fulfill that obligation, SP 800-53 was first released in 2005. Since then, NIST has continuously updated and revised the document, with the latest update, Revision 5, published in 2020.

9. From October 2018 through May 2023, Mr. Pannek was the Director – Global Data Governance, Risk and Compliance for Archer Daniels Midland Company ("**ADM**") and its wholly owned subsidiary, ADM Investor Services, Inc. ("**ADMIS**") and in that role discovered significant deficiencies in ADM's cybersecurity compliance. ADM failed to comply with a plethora of technical, administrative, and physical safeguards, which are relevant to all federal contracts and grants, including ADM's contracts with the government under which ADM had and continues to have access to unclassified controlled technical information belonging to the federal government because of food and agriculture being part of critical infrastructure.[2] Despite his role at ADM, Mr. Pannek was never tasked with ensuring that ADM was meeting federal government (or state government) agency requirements.

10. As Mr. Pannek learned during his employment, from at least 2013 through the present, Defendant ADM engaged in a scheme to knowingly enrich itself by contracting with and obtaining grants from the United States government to create, supply, and transport agriculture technologies, including food and biofuel, to various government agencies including the United States Department of Agriculture ("**USDA**"), the United States Department of Defense

---

2 *See National Security Memorandum-16 to Strengthen the Security and Resilience of U.S. Food and Agriculture* (Nov. 10, 2022), https://www.whitehouse.gov/briefing-room/presidential-actions/2022/11/10/national-security-memorandum-on-on-strengthening-the-security-and-resilience-of-united-states-food-and-agriculture/.

(“**DOD**”) with the United States Department of the Army as the subagency, and the United States Department of Energy (“**USDE**”). As detailed *infra*, a variety of laws, including FAR and FISMA, mandate, federally-authorize, and require continuous implementation of technical, administrative, and security safeguards as set forth by the National Institute for Standards and Technology (“**NIST**”) for all technology applications, including the cloud applications, that were utilized and continue to be utilized in the transfer of data between ADM and the government and in the implementation of the parameters of ADM’s federal government contracts and grants.

11. Relator has original source knowledge of ADM contracts and grants being awarded by the United States government through a variety of different agencies, including the USDA, stemming back to 2007 that did not meet the express requirements of having adequate technical, administrative, and physical safeguards in place to protect contract information residing in or transmitting from its information system. In addition to the laws and implementing agency regulations, the USDA publishes the *USDA Contracting Deskbook* (v. 3.5 is the most recent version),[3] which applies to “federal employees, contractors, and subcontractors, experts, consultants, and paid/unpaid interns” alike.[4] Policy 422.102 requires that all “[p]ersonnel must be either U.S. citizens or Lawful Permanent Residents … in order to access: 1. USDA Mission Areas, Agencies and Staff Offices or controlled facilities; or Information Technology (IT) systems or security items or products … [and requires that] Contractors must identify in their proposals the names and citizenship of all non-U.S. citizens proposed to work under the contract.”[5] As detailed

---

3 *See* https://www.usda.gov/sites/default/files/documents/usda-contracting-deskbook.pdf (effective date, Apr. 28, 2023) (noting that v. 1.01 became effective Oct. 30, 2018, as well as FAR and cybersecurity are expressly mentioned).

4 *Id.* at 95.

5 *Id.*

herein, not only was ADM unaware that it had fifty-two (52) servers in China, which were being accessed by non-U.S. citizens, it also utilized a "data lake" as a repository for information, including sensitive personally identifiable information ("**PII**") and trade secrets, including lists of U.S. farmers and shipping routes.[6] For approximately a decade, from 2013 through August 2023, D. Cameron "Cam" Findlay, SVP Chief Counsel and Secretary, was ultimately in charge of all contracts. His successor is Ms. Regina Bynote Jones.

12. ADM began contracting with the United States Government, as well as other governments, including China,[7] decades ago. While damages are only available under 31 U.S.C. §3731(b)(2) stemming back ten (10) years, ADM's knowledge of its duties under the FAR to comply with cybersecurity requirements, especially with USDA cybersecurity training and technical, administrative, and physical safeguards, is relevant to ADM's scienter given the Memorandum that was issued to USDA employees and contractors alike in 2006 emphasizing the duty to ensure that sensitive data entrusted to them is kept secure.[8]

13. ADM knowingly and intentionally (or at a minimum recklessly) violated these material requirements, which are inherent in all government contracts. In turn, to Relator's knowledge, ADM reaped approximately $861,718,363 in awards from nearly 366 contracts, from

---

6 Importantly, the "data lake" is similar to the allegations of using a general pool, the "P-Drive" in *United States ex rel. Lawler v. Comprehensive Health Servs., Inc. et al.,* Case No. 20-cv-698 (E.D.N.Y.) (disclosing that Rachel V. Rose, Esq. brought the case involving Dr. Lawler).

7 *See ADM, Vland to Launch Joint Venture to Serve Growing Chinese Demand for Human Probiotics* (Oct. 18, 2021), https://www.adm.com/en-us/news/news-releases/2021/10/adm-vland-to-launch-joint-venture-to-serve-growing-chinese-demand-for-human-probiotics/#:~:text=CHICAGO%20%26%20QINGDAO%2C%20China%2D%2D(BUSINESS.Chinese%20demand%20for%20human%20probiotics.

8 USDA, *Notice IRM-373* (Aug. 10, 2006), https://www.fsa.usda.gov/Internet/FSA_Notice/irm_373.pdf.

2013 through the present, by submitting false and fraudulent certifications associated with the United States Government procurement process and, after it was awarded the contracts, submitted claims for payment in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(A),(B), (G).

14. This matter concerns Defendant's presentations of materially false and/or fraudulent claims under the procurement and contractual procedures mandated by the United States Government in the contracts set forth in **Exhibit 1** in violation of the FCA (and related standards and laws stated herein) by engaging in the following conduct from approximately January 2013 (and likely sooner) through the present:

a. Knowing and intentional (or at a minimum reckless) falsification of compliance with FAR, FISMA, NIST, Federal Risk and Authorization Management Program ("**FedRAMP**") and other laws (including agency regulations) in its initial government procurement submissions, as well as subsequent claims for payment;

b. Knowing and intentional (or at a minimum reckless) misrepresentation of the location of its servers and data, threats and vulnerabilities to its system and in turn the United States Government, critical infrastructure, and farmers;

c. Knowing and intentional reporting od false results and falsely attesting to ongoing and adequate security monitoring and the related technical, administrative, and physical safeguards required to protect the confidentiality, integrity, and availability of the data; and

d. Knowing retention of the overpayments in violation of §3730(a)(1)(G).

From at least 2013 through the present, ADM knew, and/or reasonably foresaw, that the false and fraudulent certifications during the procurement process and the submission of claims for payment from the respective government agencies (primarily USDA), combined with its deficient technical, administrative, and physical security safeguards and privacy requirements, formed the basis of false and/or fraudulent presentations of claims to the United States.

## III. JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. §3732, which confers jurisdiction over actions brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729, 3730.

16. This Court also has jurisdiction to entertain potential common law causes of action, such as unjust enrichment under 28 U.S.C. §§ 1345 and 1367(a).

17. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and under 28 U.S.C. §§1391(b) and 1395(a), because the Defendant's corporate headquarters are located in and Defendant transacts business in the Northern District of Illinois.

18. This case was filed under seal, and there have been no known public disclosures of the allegations and transactions contained herein as defined in 31 U.S.C. § 3730. To the extent there has been such a public disclosure of any of Relator's allegations herein, Relator is an original source of those allegations within the meaning of 31 U.S.C. § 3730(e)(4)(B). Because of Relator's position within ADM, he possesses independent knowledge of the information on which the allegations are based, and this Complaint likely contains material additions to any such public disclosure. Relator also made substantive disclosures to the Government of this information prior to any public disclosure. *See* 31 U.S.C. § 3730(e)(4)(B).

19. A copy of this Complaint is being served upon the Attorney General for the United States and the United States Attorney's Office for the Northern District of Illinois. A written

disclosure statement setting forth all material evidence and information Relator possesses was also submitted to these offices as required by 31 U.S.C. § 3730(b)(2). *See* Fed. R. Civ. P. 4(d)(4).

20. Relator has complied with all conditions precedent to bringing this action.

## IV. PARTIES

***Relator***

21. **Mark Pannek, MBA ("Mr. Pannek" or "Relator")** is a senior risk management leader with over thirty-five (35) years of experience in technology governance, risk and compliance. Throughout his esteemed career, he has held a variety of vice-president level positions with major financial and healthcare institutions, including but not limited to JP Morgan Chase, Synchrony Financial f/k/a GE Capital, and U.S. Bank. From October 2018 through May 2023, he served as Director – Global Data Governance, Risk & Compliance at Defendant ADM, which also encompasses ADMIS, a wholly owned subsidiary.

22. When Mr. Pannek accepted the position at ADM, he presumed that ADM had comprehensive data governance, enterprise risk management, and cybersecurity compliance programs. In fact, ADM's related programs are grossly insufficient. ADM placed profits over people and cybersecurity. The executives and the board of directors knowingly decided not to spend money on cybersecurity compliance. Despite its public statements to the contrary,[9] ADM did not take adequate steps to implement cybersecurity safeguards required by NIST or shore up defenses against cyberattacks. It asked various internal teams, Global Information Cyber Security ("**GICS**") and Global Technology ("**GT**") to conduct internal audits. Mr. Pannek led many of the

---

[9] J. Bunge, *Food Giant ADM Bolsters Its Defense Against Hacks, CEO Says (At the Wall Street Journal's Global Food Forum)*, *WSJ* (Jun. 24, 2021), https://www.wsj.com/articles/agriculture-giant-adm-is-shoring-up-cyber-defenses-ceo-says-11624555232 ("shoring up defenses against what it views as inevitable cyberattacks" and "feel[ing] the responsibility for the supply chain" were comments made by Juan Luciano, CEO.

audits and reported the adverse findings to the Executive Team members and to the board, including the Data Lake audit (an audit that identified massive risks associated with the aggregation of data from approximately one-hundred and fifty (150) disparate global ADM applications).[10] Despite these findings, to Relator's knowledge, ADM failed to take steps to remediate these flagrant deficiencies.

23. During his nearly five (5) year tenure at ADM, Mr. Pannek repeatedly raised concerns about the technical, administrative, and physical safeguard deficiencies, as well as breaches, to executives and the board of directors. For example, in 2021, after dutifully performing a comprehensive, targeted review of the data and controls within the Data Lake – a huge repository of data from approximately 150 disparate global ADM applications (described *infra*), which revealed several deficiencies in technical, administrative, and physical safeguards. Mr. Pannek escalated the deficiencies on numerous occasions to Ms. Kristy Folkwein, Chief Information Officer ("**CIO**"), Mr. Ben Bard, Chief Compliance Officer ("**CCO**"), Mr. Tom Dager, Vice-President, Chief Information Security Officer ("**CISO**"), and Ms. Katie Licup, then Chief Privacy and Risk Officer ("**CPO**") but little if any corrective action was taken to correct the deficiencies, except to have a paper trail documenting that certain actions would be taken.

24. Despite attempting to steer ADM towards cultivating a culture of cybersecurity compliance, Mr. Pannek suffered retaliation for raising his concerns. Ultimately, ADM terminated

---

[10] Many of the findings of the Data Lake audit parallel the deficiencies which led to the DOJ's first settlement under its Civil Cyber Fraud Initiative including that "CHS staff saved and left scanned copies of some records on an internal network drive, which was accessible to non-clinical staff. Even after staff raised concerns about the privacy of protected medical information, CHS did not take adequate steps to store the information exclusively on the EMR system." *See* https://www.justice.gov/opa/pr/medical-services-contractor-pays-930000-settle-false-claims-act-allegations-relating-medical (Mar. 8, 2022) citing *United States ex rel. Lawler v. Comprehensive Health Servs., Inc. et al.*, Case No. 20-cv-698 (E.D.N.Y.).

Mr. Pannek's employment in May 2023 at the insistence of CIO Ms. Folkwein (whose malfeasance Mr. Pannek repeatedly exposed through his audits).

***Government Plaintiff***

25. The United States is the party in interest for which recovery is sought. Specifically, this lawsuit seeks damages on behalf of the United States Department of Agriculture ("**USDA**") and other relevant federal programs.

***Defendant***

26. **Archer Daniels Midland (NYSE: ADM) ("ADM")** is a publicly traded company, which was established in 1902 with its headquarters in Chicago, Illinois.

27. According to its website, "ADM is a leader in global nutrition who unlocks the power of nature to envision, create and combine ingredients and flavors for food and beverages, supplements, animal feed, and more."[11] As part of its ongoing objective to "maintain operating standards that incorporate the highest ideals of integrity and ethical business conduct"[12] ADM implemented a Code of Conduct and states that it "***is committed to conducting business in compliance with all applicable laws and regulations, including those that prohibit bribery and corruption.***"[13] (emphasis added). ADM also focuses on biomaterials, biofuels, and other leading biosolution-technologies, which would give it and the United States Government a potential competitive advantage in the global marketplace.[14]

---

11 *See* https://www.adm.com/en-us/about-adm/ (last visited Oct. 5, 2023).

12 *See* https://www.adm.com/en-us/legal/compliance/ (last visited Oct. 5, 2023).

13 *Id.*

14 *See* https://www.adm.com/en-us/products-services/industrial-biosolutions/ (last visited Oct. 3, 2023).

28. ADM has been a longtime recipient of government contracts. From 2007 through the present, ADM was awarded approximately $1.8 billion in federal government contracts, primarily from the USDA.

## V. LEGAL STANDARDS

***The National Institute for Standards and Technology ("NIST")***

29. NIST, which is a non-regulatory agency under the U.S. Department of Commerce, evolved from creating and providing guidance on standard weights and measures to setting standards, as well as system controls and guidance documents for cybersecurity. The NIST guidance documents, some of which are referred to as Special Publications, provide detailed information about "security/privacy controls which must be in place for information systems in the US Federal government."[15] Government contractors must also comply with NIST standards, as set forth below:

> The Federal Information Security Management Act of 2002 (FISMA) and Federal Information Security Modernization Act of 2014 (also called FISMA, and which updates the original law) require U.S. government agencies to implement information security controls using a risk-based approach to information security and cybersecurity assessment. Each agency must report its compliance annually to the Office of Management and Budget (OMB) — and the primary framework used for FISMA compliance is detailed in NIST SP 800-53.[16]

*NIST Special Publication 800-53* (rev. 5 and previous revisions) is particularly crucial because the technical, administrative and physical controls that are outlined form the basis of compliance with FISMA, FedRAMP, DFARS, CJIS, the HIPAA, FedRAMP + and FedRAMP DOD IL 2, 4, 5, 6 and others. Examples of the various mandated controls include access control, audit and

---

[15] A. Kraus, *NIST and FedRAMP: A Brief Overview*, available at: https://reciprocitylabs.com/nist-vs-fedramp/ (last visited Sept. 30, 2023).

[16] *Id.*

accountability, risk assessment, system and communications protection and system and information integrity.[17]

***<u>The False Claims Act ("FCA")</u>***

30. The False Claims Act is "the government's primary litigative tool for the recovery of losses sustained as the result of fraud against the government." *Avco Corp. v. U.S. Dep't of Justice*, 884 F.2d 621, 622 (D.C. Cir. 1989). The FCA imposes liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §§ 3729(a)(1)(A)-(B). Liability also arises for "reverse false claims" where any person "knowingly" concealed or "knowingly" and improperly avoided or decreased an obligation to reimburse the United States. 31 U.S.C. § 3729(a)(1)(G).

31. False and fraudulent statements during the government procurement and grant processes are material to the United States government's willingness to pay. As the United States Supreme Court stated in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016), "[w]hen ... a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided."

32. Building on this notion, the United States articulated in its Statement of Interest in *United States ex rel. Brian Markus v. Aerojet Rocketdyne Holdings, Inc., et al.*, Case No. 2:15-cv-02245, Dkt. 135, p. 2 (E.D. Ca. Oct. 20, 2021), "[i]t is well settled that when a contract is obtained

---

[17] As part of the selection and claims submission process, the International Organizational Standards ("ISO") are also used. See *ISPAB Presentation, Federal Risk and Authorization Management Program (FedRAMP)*, slide 14 (Feb. 3, 2012).

through false statements or fraudulent conduct, FCA liability attaches to each claim submitted to the government under the contract." *See United States ex rel. v. University of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006) (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542 (1943)).

***Federal Acquisition Regulations ("FAR")***

33. Codified in Title 48 of the Code of Federal Regulations (CFR) in 1984 the FAR was established to create a uniform structure for federal government procurement of supplies and services with appropriate funds.

34. FAR, 48 C.F.R. Parts 1-53, governs the acquisition of goods and services by executive branch agencies. The purpose of "[t]he Federal Acquisition Regulations System is established for the codification and publication of uniform policies and procedures for acquisition by all executive agencies. The Federal Acquisition Regulations System consists of the FAR, which is the primary document, and agency acquisition regulations that implement or supplement the FAR."[18] Each agency, in turn, has its own, related regulation. The USDA promulgated the Agriculture Acquisition Regulation ("**AGAR**"), 48 CFR Chapter 4, Parts 401 through 470.[19]

35. Section 4.1903 of the FAR requires that contracting officers "**shall insert the clause at § 52.204.21, *Basic Safeguarding of Covered Contractor Information Systems*, in solicitations and contracts when the contractor or a subcontractor at any tier may have Federal contract information residing in or transiting through its information system.**" (emphasis added). 48 C.F.R. § 52.204-21(b)(1)(i) **requires contractors like ADM that store or**

---

18 48 C.F.R. § 1.101.

19 *See https://www.usda.gov/sites/default/files/documents/unofficial-agar-10012021.pdf* (last updated Aug. 1, 2021, effective Oct. 1, 2021).

**transmit "federal contract information" to "limit information system access to authorized users", as well as "processes acting on behalf of authorized users."** (emphasis added).

36. There are four elements that comprise FAR's performance standards: (1) [s]atisfy the customer in terms of cost, quality, and timeliness of the delivered product or service…; (2) [m]inimize administrative operating costs; (3) [c]onduct business with integrity, fairness, and openness; and (4) [f]ulfill public policy objectives.[20] FAR provides the foundation for procurement and supplements individual agency regulations and additional guidance documents may also apply.[21] Pursuant to 48 C.F.R. §2.101(b), "acquisition" means:

> acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through the purchase or lease, whether the supplies or services are already in existence or must be created, developed, demonstrated, and evaluated. *Acquisition begins at the point when agency needs are established and includes the description of requirements to satisfy agency needs, solicitation and selection of sources, award of contracts, contract financing, contract performance, contract administration, and those technical and management functions* directly related to the process of fulfilling agency needs by contract. (emphasis added).

ADM had a statutory duty to be transparent, honest, and ethical with the government and fulfill public policy objectives, of which cybersecurity is one for the entire United States Government. Government funds are involved in that payment for the procured goods and/or services is paid out of the United States Treasury that are "charged to an appropriation provided by or derived from an act of Congress."[22]

---

20 48 C.F.R. §1.102-2(a)-(d).

21 Congressional Research Service, *The Federal Acquisition Regulation (FAR): Answers to Frequently Asked Questions* (2015), https://fas.org/sgp/crs/misc/R42826.pdf.

22 Office of the General Counsel, U.S. Gov't Accountability Office, Principles of Federal Appropriations Law, Vol. 1, at 2-4 to 2-5 (3d ed., 2004), at http://www.gao.gov/assets/210/202437.pdf.

***Clinger Cohen Act of 1996, Title 40***

When enacted as part of the National Defense Authorization Act for Fiscal Year 1996, Pub. L. 104-106 (Division E) (Feb. 10, 1996),[23] the Information Technology Management Reform Act ("ITMRA") (Division E) and the Federal Acquisition Reform Act ("FARA") were collectively designated as the Clinger Cohen Act of 1996.

37. The primary purpose of ITMRA was to enhance the Office of Management and Budget's ("OMB") responsibilities for improving the "acquisition, use, and disposal of information technology (IT) to improve Federal programs."[24] The overall goal was to maximize value while mitigating risk; and, the requirement that Chief Information Officers ("CIOs") be established for each Federal agency reflects this notion. Specifically, "[a]gency heads shall ensure IT performance measurements are prescribed for acquisition and use and that they measure how well IT supports agency programs. CIOs are to monitor performance of IT programs, evaluate performance of those programs based on measures, and advise agency heads on continuing, modifying or terminating the programs or projects."[25]

38. Title 40, Subtitle III, Chapter 117, Section 11703 refined procurement procedures related to information technology. "**To the maximum extent practicable, the Federal Acquisition Regulatory Council shall ensure that the process for acquisition of information technology is a simplified, clear, and understandable process that specifically addresses the management of risk, incremental acquisitions, and the need to incorporate commercial**

---

23 *See* https://business.defense.gov/Portals/57/Documents/Federal%20Acquisition%20Reform%20Act%20of%201996%20Clinger-Cohen%20Act.pdf (Aug. 2006).

24 *Id.* at 2.

25 *Id.*

**information technology in a timely manner**." (emphasis added). Subsequently, the Federal Acquisition Regulations and other laws and guidance were provided for persons participating in the Federal government's procurement process.

***Federal Risk and Authorization Management Program ("FedRAMP")***

39. Administered under the Federal Chief Information Officer's Council ("CIOC"), "FedRAMP has been established to provide a standard approach to Assessing and Authorizing (A&A) cloud computing services and products."[26]

***Federal Information Security Management Act of 2002 (FISMA)***

40. "The Federal Information Security Management Act of 2002 (FISMA) and Federal Information Security Modernization Act of 2014 (also FISMA, which enhances and clarifies the original law) require US Government agencies to implement information security controls using a federal risk based approach to information security assessment."[27]

41. In turn, the individual agency is mandated to report annual compliance to the U.S. Office of Management and Budget ("**OMB**"). The primary framework for FISMA compliance is detailed in NIST Special Publication 800-53.

***The Intersection Between NIST, FISMA and FedRAMP***

42. The Government Services Administration ("**GSA**") coordinates with the CIOC to ensure that the requisite standards are met during the procurement process.

43. NIST serves as a technical advisor to FedRAMP in two crucial areas:

---

[26] NIST, *Federal Risk and Authorization Management Program*, https://www.nist.gov/itl/federal-risk-and-authorization-management-program (last visited Oct. 3, 2023).

[27] *Id.*

1) providing recommendations on the application of NIST SP 800-37 - *Guide for Applying the Risk Management Framework to Federal Information Systems: A Security Life Cycle Approach*, and

2) providing recommendations on the application of security controls selected from NIST SP 800-53 - *Recommended Security Controls for Federal Information Systems*, for low security impact and moderate security impact Cloud Computing information systems.[28]

"FedRAMP is a government-wide program that provides a standardized approach to security assessment, authorization, and continuous monitoring for cloud products and services" to standardize and streamline the security assessment process.[29] The impetus behind both FedRAMP and FISMA was to help federal agencies ensure that security requirements are met in general and within the contract, as well as specify additional contractual safeguard requirements (e.g., higher level of encryption).

44. Meeting the NIST, FAR, FedRAMP, and/or FISMA requirements is material to the government awarding a contract and/or paying a claim because cybersecurity compliance to maintain the confidentiality, integrity and availability of the data and protect critical infrastructure is mandated by the many aforementioned laws and apply equally to federal government agencies, including the USDA and DOD, and government contractors. Even prior to November 18, 2013,[30]

---

28 *Id.*

29 ISPAB Presentation, *Federal Risk and Authorization Management Program (FedRAMP)* (Feb. 3, 2012), https://csrc.nist.gov/CSRC/media/Events/ISPAB-FEBRUARY-2012-MEETING/documents/feb3_fedramp_ispab.pdf.

30 78 Fed. Reg. 69,273 (Nov. 18, 2013) (specifically requiring DFARS Clause 252.704-7012 be incorporated into every DOD contract and intensifying the technical, administrative, and physical safeguards required by government contractors to ensure that unclassified government

the United States government incorporated terms in federal contracts setting minimum thresholds for cybersecurity to ensure that contractors were also adhering to Privacy Act requirements and minimum cybersecurity safeguards.

## VI. DEFENDANT'S SCHEMES

45. ADM's scheme is simple – don't spend money on cybersecurity compliance even though it has more than adequate resources to achieve full compliance, submit false and fraudulent statements to the United States Government in the hopes of not being caught, continue seeking additional contracts knowing that it is not in compliance, and reap nearly a billion dollars in contract awards since 2013.

46. FAR Section 4.1903 expressly requires that contracting officers "shall insert the clause at § 52.204.21, *Basic Safeguarding of Covered Contractor Information Systems*, in solicitations and contracts when the contractor or a subcontractor at any tier may have Federal contract information residing in or transiting through its information system." There is no ambiguity in this stated statutory requirement.

47. In order to be awarded grants and contracts, persons that contract with the federal government were and continue to be required to meet the NIST standards for cybersecurity set forth in FAR, FedRAMP, and/or FISMA, as well as the USDA, DOD, and DOE's implementing regulations. As set forth *infra*, ADM fraudulently induced the federal government to award them contracts and grants to provide goods and services to federal government agencies (i.e., USDA, DOD, and DOE), when they knew that they were not complying with the material contractual

data was secure, that cyber attacks were mitigated, and the prohibition on unauthorized access was reinforced.).

terms and legal requirements. ADM's knowledge of FAR and complying with cybersecurity requirements, especially with USDA's privacy and security requirements, is relevant to its scienter.

Notice IRM-373 included the July 18, 2006, David M. Combs, Chief Information Officer for the USDA, MEMORANDUM FOR ALL USDA EMPLOYEES AND CONTRACTORS (SUBJECT: Protecting and Safeguarding Privacy Act Protected Information) ("**USDA MEMO**").[31] The USDA MEMO reads as follows:

> The Department of Agriculture (USDA) has established administrative, technical, and physical safeguards to comply with the Privacy Act as well as protect its information technology systems. My memorandum of June 16, 2006 informed you about the availability of a web-based coursed in AgLearn, "USDA Privacy Basics," which teaches the Privacy Act and how protecting that data relates to the work at USDA.
>
> It is the responsibility of all of us to protect and secure our sensitive and personally identifiable information at USDA. The Office of Chief Information Officer (OCIO) believes that all employees and contractors should be cognizant of why and how to protect Privacy Act information. Therefore, effective immediately all employees and contractors are required to complete the "USDA Privacy Basics" course by September 15, 2006. This course is in addition to the annual Security Awareness Training.
>
> For additional information contact your agency Chief Information Officer or Director of Information Technology.

48. The Cybersecurity and Infrastructure Security Agency's Food and Agriculture Sector-Specific Plan ("**FASSP**"), details how the National Infrastructure Protection Plan risk management framework is implemented within the context of the unique characteristics and risk landscape of the food and agriculture sectors.[32] According to the FASSP, the FA Sector's use of interconnected Industrial Control Systems ("**ICS**"), such as Supervisory Control and Data

---

[31] USDA, *Notice IRM-373* (Aug. 10, 2006), https://www.fsa.usda.gov/Internet/FSA_Notice/irm_373.pdf.

[32] *See* CISA, *Food and Agriculture Sector-Specific Plan (SSP)* (2015), https://www.cisa.gov/sites/default/files/publications/nipp-ssp-food-ag-2015-508.pdf.

Acquisition ("**SCADA**"), renders these systems vulnerable to cyber threats. FASSP, at 7. Defendant ADM knowingly implemented unauthorized, inadequate – and in some cases non-existent – cybersecurity safeguards, putting PII (i.e., individual farmers names and locations) and other government data (i.e., development of emerging agricultural technologies, methodologies, and biofuels) at risk in violation of federal laws and regulations, while failing to consider the unique risk characteristics and landscape of the food, agriculture, national security, and energy sectors.

49. When Mr. Pannek accepted the position of Director – Global Data Governance, Risk & Compliance at Defendant ADM, he presumed that ADM had implemented comprehensive data governance, enterprise risk management, and cybersecurity compliance programs. As he learned, ADM's related programs are grossly insufficient. Mr. Pannek was aware that Ernst & Young ("**E&Y**") conducted certain third-party audits of ADM. Despite Mr. Pannek's position at ADM and his high level of expertise, Mr. Pannek was not made part of the audit process, nor did he see the final audit report(s). It is unknown to Mr. Pannek whether or not E&Y only performed a SOC 1 Report, which addresses financial controls, or if it performed both a SOC 1 and SOC 2 audit. To his knowledge, no Defense Federal Acquisition Regulation Supplement ("**DFARS**") audit was performed by a third party assessor ("**3PAO**"). In any event, ADM did not empower Mr. Pannek to remediate any of the material cybersecurity deficiencies that he uncovered from his own due diligence and revealed internally to ADM.

50. This matter concerns Defendant's presentations of materially false and/or fraudulent statements during the procurement and contractual procedures mandated by the

United States Government in the contracts set forth in **Exhibit 1**[33] in violation of the FCA (and related standards and laws stated *supra*) by engaging in the following conduct from approximately January 2013 (and likely at least a decade earlier) through the present:

- Knowing and intentional (or at a minimum reckless) fraudulent inducement and falsification of compliance with FAR, FedRAMP, FISMA, NIST, and other laws and standards in its initial government procurement contract submissions, as well as subsequent claims for payment, which were sometimes in the form of a purchase order;
- Knowing and intentional (or at a minimum reckless) misrepresentation of the location of its servers and data, threats and vulnerabilities to its system, which in turn placed the critical infrastructure of the food supply chain and agriculture

[33] Nearly ninety-nine (99) percent of the federal government contracts listed in **Exhibit 1** are with the USDA. W912EK21P0033 (start date March 24, 2021) is specific to the DOD, with the subagency being the U.S. Department of the Army (W07V ENDIST ROCK ISLAND) and a purchase order being submitted and paid for urgent drydock and repair "MV Davenport." Additionally, since 2009, ADM was awarded at least three (3) grants by the DOE related to fossil fuel and refinery development, including biofuels. Payments continued for several years after the respective contracts were awarded. *See https://www.usaspending.gov/award/ASST_NON_DEFE0001547_8900 (last visited Oct. 3, 2023);* Advanced Biofuels USA, *ADM Receives a $24.8 Million U.S. Department of Energy Grant to Develop and Commercialize Advanced Biofuels* (Dec. 8, 2009), https://advancedbiofuelsusa.info/adm-receives-248-million-us-department-of-energy-grant-to-develop-and-commercialize-advanced-biofuels/. *See also* U.S. Department of Energy, *DOE Announces Nearly $65 Million for Biofuels Research to Reduce Airplane and Ship Emissions* (Sept. 9, 2021), https://www.energy.gov/articles/doe-announces-nearly-65-million-biofuels-research-reduce-airplane-and-ship-emissions (stating that a Memorandum of Understanding was signed between the DOE, USDA, and U.S. Department of Transportation to collaborate on the research, as well as mentioning that ADM was awarded $3,466,844.00 to "couple isobutanol (a precursor for sustainable aviation fuel) fermentation with a membrane separations system – reducing energy used in the separation process by 50%.").

operations of the United States Government, the PII of farmers that ADM supplied to, and the shipping routes and ports utilized by the DOD at risk;

- Knowing and intentional reporting false results and falsely attesting to ongoing and adequate security monitoring and the related technical, administrative, and physical safeguards required to protect the confidentiality, integrity, and availability of the data; and
- Knowing retention of the overpayments in violation of §3730(a)(1)(G).

***ADM Fraudulently Induced the United States Government to Award It Contracts and Grants Knowing that It Had Woefully Deficient Cybersecurity Safeguards that Did Not Meet Government Standards and Regulatory Requirements.***

51. From at least 2013 through the present, ADM knew, and/or reasonably foresaw, that the false and fraudulent certifications during the procurement process and when claims for payment from the respective government agencies (primarily USDA) were submitted, combined with its inadequate technical, administrative, and physical security safeguards and privacy requirements, formed the basis of false and/or fraudulent presentations of meeting government contractual requirements and claims for payment to the United States. **Table A** sets forth a sample of the nearly 366 contracts included in **Exhibit 1.**

**Table A**

| U.S. Government Agency | Contract Number | Start Date | Award Amount | Notes |
|---|---|---|---|---|
| U.S. Dep't of Agriculture (USDA) | PIID 121NTB17P0184 | August 16, 2017 | $4,485,261.90 | Food for Progress from Federal Account – Commodity Credit Corporation Fund |
| USDA | PIID 121NTB23C0060 | Feb. 3, 2023 | $27,831,188 | COMMODITIES FOR USG FOOD DONATIONS: 2000009079/4210006490/SOYBEAN MEAL BULK |

| U.S. Government Agency | Contract Number | Start Date | Award Amount | Notes |
|---|---|---|---|---|
| USDA | PIID 121NTB22C0185 | Aug. 17, 2022 | $25,549,093 | COMMODITIES FOR USG FOOD DONATIONS: 2000008731/4210006226/SORGHUM BULK |
| USDA | PIID 121NTB23C0063 | Feb. 6, 2023 | $21,419,640 | COMMODITIES FOR USG FOOD DONATIONS: 2000009108/4210006493/WHEAT, HARD RED WINTER BULK |
| USDA | PIID 121NTB21C0153 | May 20, 2021 | $18,421,600 | 2000007788/4210005457/WHEAT, HARD RED WINTER BULK |
| USDA | PIID 121NTB22C0024 | Jan. 20, 2022 | $17,924,262 | COMMODITIES FOR USG FOOD DONATIONS: 2000008318/4210005876/SOYBEAN MEAL BULK |
| USDA | PIID 121NTB22C0177 | Aug. 10, 2022 | $17,597,745 | COMMODITIES FOR USG FOOD DONATIONS: 2000008702/4210006182/WHEAT, HARD RED WINTER BULK |
| USDA | PIID 121NTB23C0216 | July 26, 2023 | $17,594,655 | COMMODITIES FOR USG FOOD DONATIONS: 2000009493/4210006695/SOYBEAN MEAL BULK |
| USDA | PIID 121NTB23C0093 | Apr 26, 2023 | $17,001,255 | COMMODITIES FOR USG FOOD DONATIONS: 2000009280/4210006603/SOYBEAN MEAL BULK |
| USDA | PIID 121NTB22C0012 | Jan. 5, 2022 | $16,656,000 | COMMODITIES FOR USG FOOD DONATIONS: 2000008247/4210005829/OIL, SOYBEAN, CRUDE, DEGUMMED BULK |
| USDA | PIID 121NTB22C0157 | July 27, 2022 | $16,538,790 | COMMODITIES FOR USG FOOD DONATIONS: 2000008678/4210006155/SORGHUM BULK |
| USDA | PIID AGINTBP120079 | Aug 8, 2012 | $15,878,843 | SOL AG-INAG-S-12-0049 P-0001, (2000001181), CORN, YELLOW BULK |

| U.S. Government Agency | Contract Number | Start Date | Award Amount | Notes |
|---|---|---|---|---|
| USDA | PIID AGINTBP130067 | Aug 29, 2013 | $15,286,329 | SOL AG-INAG-S-13-0045-P0001, (2000002023), SORGHUM BULK |
| USDA | PIID 12INTB22C0029 | Jan 27, 2022 | $15,268,676 | COMMODITIES FOR USG FOOD DONATIONS: 2000008323/4210005877/SORGHUM BULK |
| USDA | PIID AGINTBP140048 | April 3, 2014 | $15,114,955 | SOL AG-INAG-S-14-0028-P0001, (2000002429), WHEAT, HARD RED WINTER BULK |
| USDA | PIID 12INTB22C0156 | July 27, 2022 | $15,032,217 | COMMODITIES FOR USG FOOD DONATIONS: 2000008678/4210006154/SORGHUM BULK |
| USDA | PIID AGINTBP160018 | Dec. 10, 2015 | $14,441,376 | SOL AG-INAG-S-16-0010,P0001, (2000003750), SORGHUM BULK |
| USDA | PIID 12INTB21C0218 | July 2, 2021 | $14,091,000 | 2000007881/4210005522/SOYBEANS, YELLOW BULK |
| USDA | PIID 12INTB21C0308 | Aug 26, 2021 | $13,630,117 | 2000008022/4210005672/SORGHUM BULK |
| USDA | PIID AGINTBP130018 | Jan 24, 2013 | $13,555,521 | SOL AG-INAG-S-13-0010-001, (20000001605), WHEAT, HARD RED WINTER BULK AND SORGHUM BULK |
| USDA | PIID AGINTBP130038 | May 15, 2013 | $12,574,959 | SOL AG-INAG-S-13-0024, (2000001776), SORGHUM BULK |
| USDA | PIID 12INTB21C0119 | April 22, 2021 | $12,392,000 | 2000007695/4210005396/OIL, SOYBEAN, CRUDE, DEGUMMED BULK |
| USDA | PIID AGINTBP150026 | March 27, 2015 | $12,336,270 | SOL AG-INAG-S-15-0017, (2000003251), SORGHUM BULK |

Despite knowledge of its obligations under FAR, FISMA, and USDA regulations and directives, ADM flagrantly misrepresented its compliance with material cybersecurity regulations.

52. As **Table B** illustrates, Relator identified ADM's deficiencies with various technical, administrative, or physical safeguards required by NIST and ISO, which are expressly referenced in FAR and FISMA, as well as other laws related to ADM's business, through a series of first-hand audits. Table B lists certain cybersecurity standards to which ADM is subjected under various sets of regulations. The sources of those standards, as listed in the column headings of Table B, include the National Institute for Standards and Technology, the International Standards Organization, the Health Insurance Portability and Accountability Act of 1996, and the Sarbanes-Oxley Act. The columns of Table B list the specific standards for data protection to which ADM is subject.

**Table B**

| NIST 800-53 | ISO 27002 | HIPAA | SOX 404 | REQUIREMENT |
|---|---|---|---|---|
| **SA-5:** Information System Documentation<br>**SA-17:** Developer Security Architecture and Design<br>**PM-7:** Enterprise Architecture<br>**SI-7** Software, Firmware, and Information Integrity<br>**SA-11** Developer Security Testing and Evaluation<br>**PL-8** Information Security Architecture | **A.12.1.4** Separation of development, test and operational environments<br>**A.9.4.5** Access control to program source code<br>**A.14.2.1** Secure development policy<br>**A.14.2.6 –** Secure development environment<br>**A.14.2.8** System security testing | **164.312(b)** Audit Controls – R<br>**164.310(b):** Workstation Use - R<br>**164.310(c):** Workstation Security – R<br>**164.308(a)(1):** Security Management Process - Information System Activity Review<br>**164.308(a)(5):** Security Awareness and Training - Log-in Monitoring A | **Application and control testing**<br>• Segregation of Duties (SoD) Testing<br>• Separation of environments (e.g. DEV, User Acceptance, PROD, Disaster Recovery)<br>• Access Controls Testing<br>• Change Mgt Testing<br>• Data Integrity & Accuracy Testing<br>• Automated Controls Testing<br>• Authorization and Approval Testing<br>• Error Handling and Exception Reporting Testing | **Application control testing** |

| NIST 800-53 | ISO 27002 | HIPAA | SOX 404 | REQUIREMENT |
|---|---|---|---|---|
| | | | • Audit Trail Testing<br>• Reconciliation and Balancing Testing<br>• User Authentication and Password Controls Testing | |
| **AT-1:** Security Awareness and Training Policy and Procedures<br>**AT-2:** Security Awareness Training<br>**AT-3:** Role-Based Security Training<br>**AT-4:** Security Training Records<br>**SA-11:** Developer Security Testing and Evaluation<br>**SA-16:** Developer-Provided Training<br>**PM-13:** Information Security Workforce<br>**PM-14:** Testing, Training, & Monitoring<br>**PM-16:** Threat Awareness Program | **A.7.2.2** Information security awareness, education, and training | **164.308(a)(5):** Security Awareness and Training - Security Reminders A<br>**164.308(a)(5):** Security Awareness and Training - Protection from Malicious Software A<br>**164.308(a)(5):** Security Awareness and Training - Log-in Monitoring A<br>**164.308(a)(5):** Security Awareness and Training - Password Management A | **Information and Communication:**<br>• Maintain accurate and complete financial records.<br>• Implement systems to capture and communicate financial data accurately and in a timely manner.<br>• Ensure that information is communicated both internally and externally in a transparent and accurate manner.<br>• Provide comprehensive training on all Policies at least annually or as new Policies are developed, while maintaining accurate training attendance and result logs. | **Training (at least annually and logged as completed)** |
| **AC-1:** Access Control Policy and Procedures<br>**AT-1:** Security Awareness and | **A.5.1.1** Policies for information security<br>**A.5.1.2** | **164.308(a)(1)** Security Management Process - | **Documentation & Documentation Controls:** | **Comprehensive policies & procedures, which address different** |

| NIST 800-53 | ISO 27002 | HIPAA | SOX 404 | REQUIREMENT |
|---|---|---|---|---|
| Training Policy and Procedures **AU-1:** Audit and Accountability Policy and Procedures **CA-1:** Security Assessment and Authorization Policies and Procedures **CM-1:** Configuration Management Policy and Procedures **CP-1:** Contingency Planning Policy and Procedures **IA-1:** Identification and Authentication Policy and Procedures **IR-1:** Incident Response Policy and Procedures **MA-1:** System Maintenance Policy and Procedures **MP-1:** Media Protection Policy and Procedures **PL-1:** Security Planning Policy and Procedures **PS-1:** Personnel Security Policy and Procedures **RA-2:** Security Categorization **SA-1:** System and Services | Review of the policies for information security **A.6.2.1** Mobile device policy **A.9.1.1** Access control policy **A.10.1.1** Policy on the use of cryptographic controls **A.13.2.1** Information transfer policies and procedures **A.14.2.1** Secure development policy **A.15.1.1** Information security policy for supplier relationships | Sanctions Policy R **164.308(a)(1)** Security Management Process - Information System Activity Review **164.308(a)(2)** Assigned Security Responsibility – R **164.308(a)(3)** Workforce Security - Authorization and/or Supervision A **164.308(a)(3)** Workforce Security - Workforce Clearance Procedure A **164.308(a)(3)** Workforce Security - Termination Procedures A **164.308(a)(6)** Security Incident Procedures - Response and Reporting R **164.308(a)(7)** Contingency Plan - Testing and Revision Procedure **164.310(a)(1)** | • Maintain comprehensive documentation of Policies, Standards, and Procedures (e.g., Code of Ethics, Code of Conduct, Segregation of Duties, Internal Controls, IT Security, Data Handling, Data Transfers, Third Party Risk Management, Regulatory Compliance, Whistle-Blower, etc) • Maintain comprehensive documentation of the company's internal control structure, including processes, responsibilities, accountabilities, and testing procedures. • Document and communicate changes to internal controls. | **standards and specific laws.** |

| NIST 800-53 | ISO 27002 | HIPAA | SOX 404 | REQUIREMENT |
| --- | --- | --- | --- | --- |
| Acquisition Policy and Procedures **SC-1:** System and Communications Protection Policy and Procedures **SI-1:** System and Information Integrity Policy and Procedures | | Facility Access Controls - Access Control and Validation Procedures A | | |
| **AC-2:** Account Management **AC-3:** Access Enforcement **AC-4:** Information Flow Enforcement **AC-6:** Least Privilege **AC-24:** Access Control Decisions **CA-7:** Continuous Monitoring **MP-3:** Media Marking **RA-2:** Security Categorization **SC-16:** Transmission of Security Attributes **SI-4:** Information System Monitoring **AC-18:** Wireless Access **AC-19:** Access Control for Mobile Devices **CA-3:** System Interconnections **CA-7:** Continuous Monitoring **CM-2:** Baseline Configuration | **A.8.3.1** Management of removable media **A.9.1.1**Access control policy **A.10.1.1** Policy on the use of cryptographic controls **A.12.4.1** Event logging **A.12.7.1** Information systems audit controls | **164.308(a)(1):** Security Management Process - Information System Activity Review R **164.308(a)(4):** Information Access Management - Isolating Health care Clearinghouse Function R **164.308(a)(4):** Information Access Management - Access Authorization A **164.310(d)(1):** Device and Media Controls - Accountability A **164.312(a)(1):** Access Control - Encryption and Decryption A | **Control Activities:** • Implement controls to prevent or detect errors or fraud that could lead to material misstatements in financial reports. • Segregate duties to prevent any one individual from having too much control over a single process (e.g., separation of duties between those who initiate, approve, and review transactions). • Implement authorization and approval processes for significant financial transactions. • Ensure accurate & timely recording of transactions. • Maintain accurate Access | Access Control Logs for all related software (including but not limited to **WeChat, WeTransfer, WhatsApp, DropBox (it is unknown if professional level Dropbox was used, which has audit logs and encryption).** |

| NIST 800-53 | ISO 27002 | HIPAA | SOX 404 | REQUIREMENT |
|---|---|---|---|---|
| **IA-3:** Device Identification and Authentication **SC-8:** Transmission Confidentiality and Integrity **SC-17:** Public Key Infrastructure Certificates **SC-40:** Wireless Link Protection **SI-4:** Information System Monitoring | | **164.312(c)(1):** Integrity - Mechanism to Authenticate Electronic Protected Health Information A **164.312(a)(1):** Access Control - Automatic Logoff A **164.312(d):** Person or Entity Authentication - R **164.312(e)(1):** Transmission Security - Integrity Controls A **164.312(e)(1):** Transmission Security - Encryption A | and Audit logs of all Servers, Applications, Networks, Mobile Devices, & Electronic Communications. • Prevent unauthorized devices connecting to network • Unauthorized Communication channels | |
| **AC-3:** Access Enforcement **AU-3:** Content of Audit Records **AU-5:** Response to Audit Processing Failures **AU-6:** Audit Review, Analysis, and Reporting **AU-9:** Protection of Audit Information **CA-7:** Continuous Monitoring **RA-2:** Security Categorization | **A.12.7.1** Information systems audit controls **A.8.2.1** Classification of information | **164.308(a)(1):** Security Management Process - Information System Activity Review R **164.308(a)(5):** Security Awareness and Training - Log-in Monitoring A **164.312(b)** Audit Controls – R | **IT General Controls:** • Implement controls over IT systems that support financial reporting (e.g., access controls, data integrity controls, change management controls, data movement). **Remediation of Deficiencies:** • Address any identified | Data classification, location, and audits of servers (Including but not limited to **Data Lake Audit #021797** and **Restricted Data Server review 10/17/2019)** |

| NIST 800-53 | ISO 27002 | HIPAA | SOX 404 | REQUIREMENT |
|---|---|---|---|---|
| **IA-10:** Adaptive Identification and Authentication | | | deficiencies in a timely manner.<br>• Implement corrective actions to enhance control effectiveness | |
| **SC-8:** Transmission Confidentiality and Integrity<br>**MP-5:** Media Transport<br>**RA-2:** Security Categorization<br>**SC-16:** Transmission of Security Attributes<br>**SI-4:** Information System Monitoring<br>**SC-28:** Protection of Information at Rest<br>AC-4: Information Flow Enforcement<br>CA-3: System Interconnections | **A.13.2.2** Agreements on information transfer<br>**A.13.2.1** Information transfer policies and procedures<br>**A.8.3.3** Physical Media Transfer<br>A.18.1.4 Privacy and protection of personally identifiable information | **164.310(d)(1):** Device and Media Controls - Accountability A<br>**164.312(a)(1):** Access Control - Encryption and Decryption A<br>**164.312(e)(1):** Transmission Security - Integrity Controls A<br>**164.312(e)(1):** Transmission Security - Encryption A<br>**164.312(e)(1):** Transmission Security - Integrity Controls A<br>**164.312(e)(1):** Transmission Security - Encryption A | **IT General Controls:**<br>• Protect sensitive PII, financial, and proprietary data through secure access and data encryption throughout the data lifecycle. | Encryption of data at rest and in transit |
| PM-15 Contacts with Security Groups and Associations | **A.18.1.1** Identification of applicable legislation and contractual requirements<br>**A.18.1.2** | 164.308(b)(1) Business Associate Contracts and Other Arrangement - Written Contract or | **Key Data Sharing Contractual Considerations**<br>• Data Usage and Processing Purpose<br>• Confidentiality and Security | Business Associate Agreement or similarly named Data Privacy & Security Agreement |

| NIST 800-53 | ISO 27002 | HIPAA | SOX 404 | REQUIREMENT |
|---|---|---|---|---|
| | Intellectual property rights (IPR) **A.15.1.2** Addressing security within supplier agreements | Other Arrangement R | • Compliance with Laws and Regulations<br>• Data Ownership and Control<br>• Data Handling & Protection<br>• Data Sharing Restrictions<br>• Data Retention and Deletion<br>• Data Quality and Accuracy<br>• Data Access and Sharing Protocol<br>• Data Breach Notification<br>• Audit and Compliance<br>• Right to compel Remediation<br>• Monitoring Liability and<br>• Indemnification<br>• Data Transfers Across Borders<br>• Data Access Restrictions<br>• Data Sharing<br>• Termination<br>• Dispute Resolution<br>• Business Associate Agreement | |
| **RA-1:** Risk Assessment Policy and Procedures **RA-2:** Security Categorization **RA-3:** Risk Assessment **RA-5:** Vulnerability Scanning | **A.18.2.1** Independent review of information security **A.18.2.3** Technical compliance review | **164.308(a)(1)** Security Management Process - Risk Analysis R **164.308(a)(1)** Security Management Process - Risk Management R | **Control Environment and Risk Assessment:**<br>• Establish a strong control environment through a formal code of ethics, corporate | Annual Risk Analysis/Risk Assessment/SOC Report performed by a qualified third party |

| NIST 800-53 | ISO 27002 | HIPAA | SOX 404 | REQUIREMENT |
|---|---|---|---|---|
| **RA-6:** Technical Surveillance Countermeasures Survey<br>**PM-12:** Insider Threat Program<br>**PM-16** Threat Awareness Program | | | governance structure, and tone at the top.<br>• Conduct a comprehensive risk assessment to identify and evaluate potential risks to financial reporting accuracy.<br><br>**Monitoring Activities:**<br>• Continuously monitor and assess the effectiveness of internal controls.<br>• Conduct periodic internal control reviews and audits to identify and address deficiencies.<br>• Conduct independent reviews and audits of information security and control environment to identify and address deficiencies. | |
| **CP-9**: Information System Backup<br>**CP-10:** Information System Recovery and Reconstitution<br>**MP-4:** Media Storage | **A.12.3.1** Information backup<br>**A.18.1.3** Protection of records<br>**A.17.1.1** | **164.308(a)(7):** Contingency Plan - Data Backup Plan R<br>**164.308(a)(7):** Contingency Plan - Disaster | **Disaster Recovery / Business Continuity**<br>• Risk Assessment and Business Impact Analysis | Individual Office Business Continuity and Disaster Recovery Plans (including international locations) |

| NIST 800-53 | ISO 27002 | HIPAA | SOX 404 | REQUIREMENT |
|---|---|---|---|---|
| | Planning information security continuity **A.17.1.2** Implementing information security continuity **A.17.1.3** Verify, review and evaluate information security continuity **A.17.2.1** Availability of information processing facilities | Recovery Plan R **164.308(a)(7):** Contingency Plan - Testing and Revision Procedure A **164.310(d)(1):** Device and Media Controls - Data Backup and Storage A | • Business Continuity Planning • Data Backup and Recovery • Redundancy and Failover • Emergency Response Procedures • Alternate Worksite and Remote Work • Testing and Exercises • Vendor and Supplier Management • Crisis Communication • Regular Review and Update | |
| **CM-8:** Information System Component Inventory **PM-5:** Information System Inventory **PS-7:** Third-Party Personnel Security **SA-5:** Information System Documentation **SA-19** Componen t Authenticity **PM-7** Enterprise Architecture | **A.8.1.1** Inventory of assets **A.8.1.2** Ownership of assets **A.14.2.7** Outsourced development **A.15.2.1** Monitoring and review of supplier services **A.15.2.2** Managing changes to supplier services | **164.310(b)** Workstation Use – R **164.310(c)** Workstation Security - R | **IT General Controls:** • Maintain comprehensive inventories of IT Assets (e.g., Servers, Applications, Data Transfers, and Third Parties) | Asset Inventory (Including but not limited to **Servers, Applications, and Third Parties)** |

53. Notably, IT related internal audits at both ADM and ADMIS were nearly one hundred percent (100%) focused on perceived Sarbanes-Oxley Act of 2002 (“**SOX**”) financial

audit control testing and compliance and not on the cybersecurity of its IT environment as required by FAR, FISMA, and NIST. The internal audits seldom test beyond a very limited scope, so non-approved communication channels (e.g., non-professional grade Dropbox, WeTransfer, WeChat, personal Gmail, etc.) were not audited and are regularly used at both ADM and ADMIS. [**ADM did not empower Mr. Pannek or his team to conduct such audits.**]

54. In 2022, ADM generated $101 billion in Revenues and $4.3 billion in Net Earnings. As such, ADM is a company with ample financial resources to comply with the NIST standards, as well as cybersecurity requirements associated with FAR, FISMA, FedRAMP and/or the agency's related regulations – it flagrantly chose not to.

***ADM Knowingly Failed to Implement Adequate Cybersecurity Risk Management and Secure Data and Knowingly Failed to Disclose Known Deficiencies and Breaches.***

55. Mr. Pannek observed first-hand deficiencies with cybersecurity risk management, compliance, and reporting obligations, as required by the USDA and other federal government agencies under FAR and FISMA. Instead of creating a secure IT environment and cultivating a culture of compliance, Defendant ADM blatantly continued to ignore the increasingly scrutinized cybersecurity requirements of government agencies, including the USDA. For example, on May 24, 2022, the USDA issued *Departmental Notice (DN 3540-004) - Subject: Information and Communication Technology Supply Chain Risk Management (ICT SCRM)*[34] to emphasize that "[a] key tenant for compliance with this requirement is the incorporation of information security into supply chain risk management (SCRM) processes."[35]

---

[34] USDA, *Departmental Notice No. DN 3540-004* (May 24, 2022), https://www.usda.gov/sites/default/files/documents/dn-3540-004-ict-supply-chain-risk-management.pdf.

[35] *Id.*

56. Subsequently, on May 30, 2023, DN 3540-004, was elevated to a *Departmental Regulation (DR 3540-004) – Information and Communication Technology (ICT) Supply Chain Risk Management (SCRM)*, and makes clear that NIST SP 500-53 (rev. 5) and laws such as FAR and FISMA apply, and cover "contractors, subcontractors, or other organization[s]" in addition to the USDA's own workforce members.[36] The information that ADM stores and/or transmits with or on behalf of the United States government to farmers, subcontractors, or subsidiaries, constitutes trade secrets under the Defend Trade Secrets Act of 2016, which heightens ADM's turning a blind-eye to its non-compliance with United States government cybersecurity requirements. Material examples appear below.

57. ADM has grown aggressively through acquisitions. Although ADM has acquired numerous companies, historically they have not integrated the acquired company's technologies (e.g. Servers, Systems, Applications, Data Bases, etc.) into a common ADM Technology footprint. This has created a highly complex and hyper fragmented technology environment with inconsistent, inaccurate, redundant, and unreliable data. Adding to this technology/data challenge, ADM outsourced its Global IT functions to a third-party (TCS – Tata Consulting Services) five years ago (2018) which resulted in significant knowledge loss. Across ADM's unsecure technology environment there are:

- ~2,000 Applications
- 1,000s Data Bases (sql, DB2, etc)
- 1,000s Servers
- ~25,000 Data Transfers

---

36 USDA, *Departmental Regulation No. DR 3540-004* (May 30, 2023), https://www.usda.gov/sites/default/files/documents/dr-3540-004.pdf (noting the expiration date of May 30, 2028).

- ~10,000 Third Parties
- Repositories (Data Lakes, Warehouses, Documents, & Images, etc.)
- Unknown number of API's (Application Programming Interface) & ODBC's (Open Data Base Connectivity)

***ADM Does Not Appreciate the Ingress and Egress of Data.***

58. ADM does not have, maintain, and cannot produce a complete and accurate inventory of all ADM data transfers coming into and out of ADM (e.g., FTP, FTPS, SFTP, Direct Connections, Drop-Box, WeTransfer, etc.) that identifies the following:

  - Legal Entity Name & Address receiving or sending the data
  - Legal Contract, Contract Reference ID, and Contract Maturity for data sharing
  - Third Party Identification Reference Number
  - The Business Purpose and Justification for the data Transfer
  - Type of Data being Transferred
  - Schema including specific fields (e.g., Name, SSN, Passport #, Bank Account, etc.)
  - Country of Data Transfer Origin
  - Country of Data Transfer Termination
  - Frequency of Data Transfer
  - Date of First Transfer
  - Date of Last Transfer
  - Volume
  - Security and/or Method of Obfuscation during transfer
  - Who authorized the Transfer

59. ADM does not know who they are sending data to, receiving data from, the type of data, the method of securing the data, which Country specific regulations apply, or if there is a legal basis for the transfer. Mr. Pannek also identified that PII is frequently not protected or encrypted during transfer.

60. The Data Transfer issue was formally identified in April 2019 via the IT Risk Register and shared with IT Leadership including Mr. Dager (CISO), Ms. Folkwein (CIO), and Mr. Nielander (VP Infrastructure).

61. Additional data movement technologies exist and are largely used internally between applications, databases, and end users. Similar to the data transfer issue, a complete inventory of these, including the applications and data involved, does not exist. This would include:

- API – Application Programming Interface
- ODBC – Open Database Connectivity
- ETL – Export Transform & Load Technologies (e.g. BODs, Clik Replicate, etc)
- BOTs – roBOTs CRT programs, acting as an agent for a user or another program
- Direct Connections

There is anecdotal evidence that vendor/third-party/subcontractor relationships have been terminated over ADM's history, but there has been no attempt to stop/turn off the ongoing data transfers, which is violative of FAR and places the data exchanged with the United States government and farmers in relation to its contracts at risk of a material breach. The authorization and setup of new data transfers can be described as haphazard, slapdash, and desultory at best.

62. Data transfers were often set up and scheduled without any due diligence or even the validation that a contract existed and that appropriate technical safeguards were in place as

required by NIST. As recently as early 2023, ADM placed a review process for new data transfers, but this process did not address the tens of thousands of existing transfers or the validation that existing contracts existed. Having said that, this review process is voluntary with no active controls to ensure it is followed, and it is often usurped. Because ADM does not know where their data is going to or coming from, the data in ADM applications, including those covered under FAR, cannot be trusted or relied upon. It is estimated that there are ~25,000 Data Transfers at ADM. This number could be low, simply nobody knows with certainty. Given the lack of Transfer Inventories, this creates a Regulatory compliance nightmare, as invisible cross border transfers of data occur routinely. Each country has unique Regulatory requirements including safeguarding, disclosure, and subject consent. In formal Quarterly ERM reports, ADM estimates this risk to be $369,000,000. When Mr. Pannek was terminated on May 25, 2023, he was actively soliciting project proposals from external consulting firms to define the Data Transfer inventory.

***Data Lake is a Vast Cybersecurity Liability.***

63. The ADM data lake ("**Lake**") is a huge repository of data from approximately one-hundred and fifty (150) disparate global ADM applications, which intertwine with U.S. data. Many of these applications are enormous in size both in the number of fields/data elements and total records. As mentioned *supra*, ADM has a highly fragmented technological environment. The Lake is an attempt to gather varied data together in one place for ease of aggregation, analysis, reporting, and feeding downstream systems. The Lake is approximately three years old. From the inception the Lake was poorly designed, architected, controlled, and executed. Internally, ADM estimates the shareholder risk associated with the Lake to be $180,400,000.

64. In 2021, ADM's Data Governance Office, which encompassed Mr. Pannek's team, performed a targeted review on the data and controls within the Lake. Material weaknesses that do

not meet NIST standards and in turn FAR and FISMA requirements, which were identified by Mr. Pannek's team include the following:

- In lieu of identifying and ingesting only the specific data needed to perform desired analysis/reporting, Global Technology ("**GT**") used a command ***"Select *"*** to ingest ALL data within the application, including PII, financials, and intellectual property. This was done as a "convenience" and for "speed" for GT.
- Inadvertently, hundreds of millions of PII records were ingested.
- No attempt was made to encrypt or obfuscate Restricted Data.
- No formal process for reviewing and authorizing USER access to the data.
- Excessive Access, including Alter/Update, was granted to approximately 500 USERS (both ADM Employees and Third-Party Consultants).
- ADM never documented a legitimate business purpose for the processing of PII and "why" they needed to run reports on individuals bank account numbers, Social Security Numbers, and/or other PII.
- There was never an attempt to disclose to the individuals the processing of PII nor was individual consent obtained.
- IT General Controls were never implemented for the Lake, access, or data feeds.

The identified control weaknesses of the Lake, which appear *supra* in **Table B**, were escalated, numerous times, to the Chief Privacy Officer (Licup), the Chief Compliance Officer (Bard), the Chief Information Security Officer (Dager), and formally escalated on January 13, 2022 to Chief Information Officer (Folkwein) with two recommendations:

- Formally acknowledge the Risk of the Data Lake, establish a high priority mitigation plan, and execute corrective action within 1 year timeframe

  - or –

- Freeze the Data Lake entirely, including all access, data, and feeds until such time that appropriate data handling controls could be implemented and tested.[37]

In response to the escalation of these issues, Ms. Licup made two related requests:

- Licup recommended to Remove all PII from the Lake and by Policy prevent it from being reintroduced.
- To validate DGO findings, Licup requested Internal Audit to perform an independent review of Data Lake Governance and appropriate accountability.

In response to Chief Privacy Officer's request, Internal Audit performed an independent review over two (2) months (March 15, 2022 through May 17, 2022) of the Lake and DGO findings. The formal audit report confirmed all previous findings of Data Governance Office. The Final report was issued July 12, 2022, and distributed to all Executive Leadership including Mr. Luciano (CEO), M/M Young & Luther (CFOs), Mr. Bard (CCO), Ms. Folkwein (CIO), Mr. Dager (CISO) among others. ***Within (3) days of the final audit report, on July 15, 2022 Folkwein (CIO) retaliated and dismantled the Data Governance Office thus fatally hamstringing mitigation of the known Lake issues and other cybersecurity deficiencies***. (emphasis added).

***<u>ADM's Third Parties, Including Subcontractors, Pose a Threat to the United States.</u>***

65. ADM does not have an accurate or complete inventory of all subcontractors or other third-parties. It is estimated that ADM has in excess of approximately 10,000 third parties with

---

37 Ms. Folkwein intentionally ignored both recommendations and failed to take action. Additionally, neither Mr. Dager nor Mr. Bard took steps to mitigate these issues.

which it interacts; however, per the internal audits and discussions, no one knows with certainty the exact number. Many of the Third-Parties perform critical functions for ADM (e.g. TCS performs all backroom technology operations for ADM). ADM's business would be severely impacted without the use of third-parties or subcontractors to carry out its business operations. The following are known deficiencies of the Third-Party Risk Program:

- ADM does not actively monitor all third-party control environments (e.g. access controls, segregation of duties, encryption, change management, security monitoring, disaster recovery, financials, legal, breaches, etc.) on a routine and scheduled basis. Out of +10,000 Third-Parties, ADM performs cursory monitoring (Desk top reviews only) on approximately 75 or so annually.
- There is no on-site Due Diligence, testing, or auditing of Third-Party Control environments performed.
- ADM does not have real time PESTLE monitoring (Political, economic, social, technology, legal, and environmental) on ALL of our third parties, rather ADM monitors only a handful, again.
- Further, ADM is unable to restrict or monitor third-parties use of Nth parties for sharing of ADM's data. ADM is unaware of the extent of its use of Nth parties.
- The vast majority of ADM third-party contracts are legacy contracts, often third-party paper/contracts provide by the vendor, and do not include required language for protecting ADM data, breach notification, indemnification, or use of Nth parties.
- A few years back ADM did implement a "Cloud Vetting" review which performs a limited technology review for new Third-Parties (approx. 75 – 100 a year).

- To perform and document all Third-Party due diligence, testing, and auditing for +10,000 Third-Parties, ADM has dedicated (1) single individual full time.

ADM fraudulently induced and continues to induce reliance by the USDA, DOD, and DOE, while knowing that it has been and continues to be at risk of legal, financial, reputational, regulatory, data breach, and denial of service risks.

***ADM's Elusive Shadow IT Implementation Diverges from NIST Standards and Government Contract Requirements.***

66. ADM's business is organized across thirteen (13) End-to-Processes (e.g., Hire to Retire, Prospect to Cash, Global Technology, etc). Because of the hyper fragmented technology environment coupled with Global Technology's inability to deliver value to the business, many of the end-to-end processes have operated technology and analytic functions in the shadows, commonly called "Shadow IT," in an effort to meet their business respective objectives. Accordingly, the objectives of federal government contracts and grants were not being met because Shadow IT creates an inconsistent control environment, excessive access to data (e.g. financials, PII, intellectual property), unreliable and non-scalable architecture, hidden configurations, inadequate change control, and questionable Disaster Recovery/Business Continuity Plan effectiveness.

67. ADM, farmers and the United States government are at risk of data loss and critical infrastructure compromise, non-compliance, security, solution redundancy, and inefficiently designed architecture vulnerabilities through the unauthorized use of Shadow IT, which is quasi-Information Technology Functions (e.g., Programming, Configurations, Change Management, etc) being performed in the Business outside of the controlled environment and oversight of IT. Shadow IT is a pet peeve and thorn in the side of Folkwein (CIO). Folkwein has been wholly unable to address or eliminate Shadow IT.

***IT General Controls Are Deficient in both Form and Substance.***

68. IT General Controls are reasonably documented at ADM, however ineffectively implemented on a very limited basis across the global technology footprint. ADM has limited implementing IT General Controls to only applications (approximately 350) which have been identified as SOX relevant and then only on an application level. This limited control footprint is where ADM has concentrated their efforts, testing, and IT Audit reviews. IT General Controls have not been implemented across the following:

- Data Lake
- Data Repositories
- SQL & DB2 Databases
- Servers
- Third Parties
- Data Movements (e.g. FTP, FTPS, SFTP, Direct Connections, API, ODBC, ETL, BOTs, etc)
- The vast majority of all ADM applications

While ADM performs IT General controls on the approximately three-hundred and fifty (350) SOX relevant applications they cannot validate or provide assurance of the underlying data within those applications. The reason is this data has been acquired by a multitude of varied sources, which do not have general IT controls that meet the NIST Cybersecurity Framework, implemented. Beyond this, Global Information Cyber Security (ADM centralized its Info Security Department) only administers User Access to ~150 applications and no servers or data lakes. User Access is administered piece meal across the business, IT, or DBAs. There is no consistency in the administration of User Access.

***Breach Processes and Business Continuity Failed to Meet NIST Standards.***

69. To Mr. Pannek's knowledge, ADM does not have a formal policy on handling data breaches, providing timely notice after a breach, nor roles and responsibilities for handling breaches (e.g., a policy for each ADM office addressing its obligations under a variety of laws

including FAR). ADM's Disaster Recovery and Business Continuity Policy and Procedure is woefully deficient and does not include any communication chart, assessment of risks in a given office (i.e., severe snow, fire, hurricanes, or terrorist attack likelihoods), and does not mention remote workers. **[ADM did not empower Mr. Pannek to create or enforce such a policy.]**

70. Given the lack of formal process, handling breaches at ADM is largely haphazard and inconsistent at best. And given ADM's lack of both contracts and controls around data transfers and third parties, Mr. Pannek concluded that ADM is currently experiencing hundreds of unreported breaches on a monthly basis. Because these administrative requirements do not exist or are present in form only, ADM is not meeting the NIST SP 800-53 (rev. 5) and other NIST requirements, which have been set forth and many of which have been required of contractors for decades.

71. Recently in spring of 2023, ADM experienced a breach via Artificial Intelligence (AI) version of social engineering. As Mr. Pannek understands it, AI was used to imitate or mimic a lawyer's voice. This voice was then used to target an ADM employee with the promise that the individual would be promoted but this was highly confidential. The goal was for the bad actor to gather process and authorization information on setting up new vendors and payment processes. This went on for a bit as the ADM employee unwittingly provided the requested information. Eventually the ADM employee suspected it was a scam and notified Global Information Cyber Security.

***ADM Knowingly Operated in China and Should Have Known Its Data was Exposed.***

72. On August 12, 2023, Jennifer Easterly, Director of the U.S. Cybersecurity and Infrastructure Security Agency ("CISA"), remarked "I hope that people are taking seriously a pretty stark warning about the potential for China to use their very formidable capabilities in the

event of a conflict in the Taiwan straits to go after our critical infrastructure."[38] This statement goes to the heart of the concerns that Mr. Pannek raised during his tenure at ADM.

73. ADM has thousands of servers around the world. An accurate or exact inventory is not available. An example of this occurred while submitting ADM's application for the Chinese Privacy Law ("**PIPL**") in February 2023. In a meeting with PWC and Mr. Slavik (new CPO), Mr. Dager (CISO) repeatedly claimed and emphasized that ADM had no servers in China. In fact, Mr. Pannek's team quickly identified over 52 individual servers in China. Mr. Dager, the Chief Information Security Officer was oblivious to the existence of these servers, which suggests that he failed to protect the data on those servers. A detail review of 4 Servers was performed in October 2019 with a scope of ADMSQLD8_SQLD8 (Development); ADMVSQL12_SQL12; ADMVSQL13_DATAMINESQL; and ADMVSQL20_SQL20. The findings of the review were dismal and are set forth in **Table C**.

**Table C**

| **Bottom Line Up Front** | **Rating** |
|---|---|
| Restricted Data (in volume) exists in non-encrypted or unmasked format (plain text). | Unsatisfactory |
| The process to ensure access rights for terminated / transferred employees & contractors, are removed and / or modified timely to guarantee access privileges are appropriate at all times is not functioning effectively. | Unsatisfactory |
| There exists inappropriate or excessive access, which could allow a user to perform functions that may potentially lead to fraudulent activity. | Unsatisfactory |
| Access Logs do not exist showing successful login attempts/access to data. | Unsatisfactory |
| Significant number of Database USER IDs have demonstrated a vulnerability to being Phished. | Unsatisfactory |

38 K. Collier, *Top U.S. cyber official offers 'stark warning' of potential attacks on infrastructure if tensions with China escalate* (Aug. 12, 2023), https://www.nbcnews.com/tech/security/top-us-cyber-official-warns-infrastructure-attack-risk-china-tensions-rcna99625.

Millions of highly Restricted records (e.g., financials, PII, intellectual property, etc.) in an unprotected state were identified across the servers. A particularly troubling issue was identified on ADMSQLD8_SQLD8. Although designated as a development server (for which there are typically far fewer controls in place than a Production Server), a SQL database (**"ESYDB"**) was operating a critical payroll functionality. Before the creation of the Lake, SQL databases were often used to collect and aggregate like data from disparate systems.

74. ESYDB, developed by Bob Baston (still at ADM), performs this function for numerous payroll systems across ADM, which has approximately 150 payroll applications globally. While not all payroll applications are here, a substantial number are. ESYDB is subsequently used to feed core HR applications.

75. The problem is that ESYDB had excessive user with Highly Privileged Access (**"HPA"**). In addition, there were no IT General controls implemented over ESYDB. There was no tracking or audit logs to identify if data was changed or manipulated prior to feeding core human resources applications. There was also substantial amounts of unprotected PII and payroll data of current and former employees (including Executive Leadership).

76. The final server review was issued October 17, 2019. The final report was distributed to Mr. Dager (CISO) and Ms. Folkwein (CIO), among others. A formal corrective action plan was developed and agreed to; however, Mr. Pannek did not witness the implementation of the corrective action item which were identified. In addition to poorly controlled SQL servers which feed core applications and the lacking inventory of servers, widespread material control weaknesses were identified on numerous shared servers exposing ADM (and its shareholders), its subcontractors, and the United States government to associated losses of legal, financial, reputational, regulatory, data breach, and denial of service attacks. ADM has thousands of shared

servers, and these types of serious issues, which Mr. Pannek identified across the continuum, which do not meet NIST standards and, in turn, FAR and FISMA requirements. Access to these servers is inconsistent, not consistently monitored, and poorly managed. Examples of identified issues include:

- **Automation Anywhere Credential Vault HASH - Exposed** [\\ldcautodsp01\Repository\Server Files\CredentialVault.dat]




- **BOT IDs, Passwords, API credentials (including API Keys)** [\\ldcautosdsps01\Repository\Server Files\Default\Automation Anywhere\MyDocs\ADMProcess\ITandGBS\Global\BotPasswordRotationBI\BotPasswordRotationBI_Config.txt]




77. Additional examples of PII and trade secrets exist. In February 2023, during a meeting with Ms. Slavik, Mr. Dager, and a PwC consultant, Mr. Dager repeatedly claimed and

emphasized that ADM had no servers in China. As illustrated above, not only did ADM have fifty-two (52) servers, which Mr. Pannek quickly identified, they also contained sensitive data. It is disconcerting and perplexing that a CISO would not know or would vehemently deny the existence of servers and data in China, especially in light of the China's Personal Information Protection Law ("**PIPL**"), which became effective in November 2021, and is designed to prevent companies and others who gather data from misusing data.

78. As illustrated herein, there are numerous material omissions and commissions which were concealed from the respective government agency. In turn, this led to ADM's knowing and systemic submission of false and fraudulent statements during the procurement process and when submitting claims for payment from the United States government of nearly $862 million from 2013 to the present.

## VII. CONCLUSION

79. From 2013 through the present, ADM reaped approximately $861,718,363 in awards from nearly 366 contracts, through the submission of false and fraudulent certifications associated with the procurement process and claims for payment in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(A),(B), (G).[39] As stated *infra*, stemming back to August 2006, all USDA employees and contractors (including ADM), have not only known about the cybersecurity requirements related to protecting and securing data, but they also had to and continue to have to undergo cybersecurity training in order to protect Privacy Act information and data related to critical infrastructure.

[39] Notably, ADM received United States government contract awards for approximately 541 contracts from 2007 to December 31, 2012, which total nearly $1,026,308,223.

80. In sum, ADM's conduct and the subsequent damages under the FCA flow from its false and fraudulent statements, irrespective of the services it provided. The data in the servers in China, as well as other sensitive information germane to the critical infrastructure of the United States was not secured in a manner consistent with NIST, as required by FAR and other laws. Relator has highlighted Defendant's false, fraudulent, and deficient certifications and attestations, for which payments were reaped by Defendant ADM from the United States.

81. To date, Relator has no knowledge that Defendant ADM attempted to voluntarily repay the federal government the millions of dollars it reaped through the aforementioned alleged fraud or correct its substandard cybersecurity technical, administrative, and physical safeguards, which continues to put the critical infrastructure of the United States, farmers, and citizens at risk.

## VIII. CAUSES OF ACTION

### COUNT I

**False Claims Act – 31 U.S.C. § 3729(a)(1)(A)**

***(Violations of the FCA: Presenting False Claims for Payment Against Defendants)***

82. The Relator repeats and realleges the facts and allegations above as if fully set forth herein.

83. Defendant engaged in interstate commerce when the invoices, which are material, were submitted to the United States Government through either the United States mail and/or electronic submission via the internet.

84. Through the acts and inaction alleged above, Defendant knowingly presented or caused to be presented false or fraudulent claims to the United State Government for payment or approval, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

85. Through the acts and inaction alleged above, Defendant knowingly made, used, or caused to be made or used, false or fraudulent records and statements, including compliance with FAR, material to false or fraudulent claims within the meaning of 31 U.S.C. § 3729(a)(1)(B).

86. Defendant violated the federal False Claims Act by submitting, or causing to be submitted, claims for reimbursement from federal agencies, including the USDA and USDE knowing that those claims were ineligible for the payments demanded.

87. Each individual contract and subsequent claim for payment for the USDA and USDE, as a result of the Defendant's illegal conduct, represents a false or fraudulent record or statement. Relator cannot now identify all of the false claims for payment that Defendants' conduct caused. The false claims were presented by the thousands, and over many years.

88. The United States Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continues to pay claims that would not be paid but for Defendant's unlawful conduct.

89. By reason of Defendant's acts, the United States has been, and may continue to be damaged in a substantial amount to be determined at trial.

90. Additionally, the United States is entitled to the maximum penalty for each and every false and fraudulent claim made and caused to be made by Defendant arising from its unlawful conduct as described herein.

91. All of the Defendant's conduct described in this Complaint was knowing, as that term is used in the federal False Claims Act, and material, as that term is defined in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

## COUNT II
**False Claims Act – 31 U.S.C. § 3729(a)(1)(B)**
***(Violations of the FCA: Use of False Statements Against Defendants)***

92. The Relator repeats and realleges the facts and allegations above as if fully set forth herein.

93. This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. §3729, *et seq*., as amended.

94. During the relevant period, Defendant knowingly applied for and accepted numerous government contracts, as identified *supra*, and presented numerous claims for payment to the United States Government through the USDA and USDE. For reasons alleged herein, many of these claims were knowingly false and fraudulent within the meaning of the False Claims Act. More specifically, Defendant knowingly presented, and caused to be presented, to an officer and/or employee of the United States Government, directly or indirectly, false and fraudulent claims for payment and approval in violation of 31 U.S.C. §3729(a)(1)(B).

95. Each claim submitted to the USDA or USDE for a contract which was procured by such fraud is false even in the absence of evidence that the claims were fraudulent in themselves. In other words, where Defendant obtained a contract through false statements, the FCA is violated when the Defendant submits claims under that contract.

96. Defendant had actual knowledge of the falsity of these claims, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the False Claims Act.

97. The United States Government suffered damages as a result of false claims by Defendant and is entitled to recover its losses and otherwise obtain relief available under the False Claims Act.

## COUNT III
**False Claims Act – 31 U.S.C. § 3729(a)(1)(G)**
***(Violations of the FCA: Failure to Repay Government Funds Against Defendants)***

98. The Relator repeats and realleges the facts and allegations above as if fully set forth herein.

99. This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended.

100. During the relevant period, Defendant knowingly applied for and accepted numerous government contracts, as identified *supra*, and presented numerous claims for payment to the United States Government through the USDA and USDE; and knowingly retained the overpayments in violation of 31 U.S.C. §3729(a)(1)(G) when Defendants failed to repay the money to the United States Government.

101. Defendant had actual knowledge of the falsity of these claims, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the False Claims Act.

102. The United States suffered damages as a result of the reverse false claims that were knowingly retained by the Defendant and is entitled to recover its losses and otherwise obtain relief available under the False Claims Act.

## IX. DAMAGES AND PENALTIES

103. The False Claims Act imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim; conspires to commit a violation of the False Claims Act or knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government (or state), or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government (or state). 31 U.S.C. § 3729(a).

104. When the government contracted with Defendant, it did not just purchase particular products and instead expected that Defendant would meet certain cybersecurity requirements. Even if the products that Defendant delivered were free of defect, the Defendant's failure to

comply with cybersecurity requirements rendered the claims false because Defendant failed to satisfy a material requirement. The government was damaged because it did not derive the full value for which it paid the Defendant.

105. Prior to 2016, the last increases to the penalties for False Claims Act violations occurred on August 30, 1999 and changed the minimum from $5,000.00 to $5,500.00 and the maximum from $10,000.00 to $11,000.00, plus treble damages. 64 Fed. Reg. 47099, 47104 (Aug. 30, 1999).

106. For violations occurring after November 2, 2015, the new minimum and maximum penalties are $10,781.00 to $23,607.00 plus treble damages. 81 Fed. Reg. 42491, 42494 (Jun. 30, 2016); 87 Fed. Reg. 2187 (Jan. 13, 2022). For violations between May 9, 2022 and January 29, 203, the penalty range is $12,537 to $25,076 and for violations after January 30, 2023, the penalty range as of the date of this Complaint is $13,508 to $27,018, plus treble damages.

107. Defendant submitted false and fraudulent certifications during the procurement process and claims for payment to the United States Government, which were paid and resulted in hundreds of millions of dollars in remuneration paid to the Defendants beginning in at least 2013 through the present.

## X. PRAYER FOR RELIEF

WHEREFORE, Relator prays on behalf of the United States of America, that judgment be entered in favor of the United States and against Defendant, as follows:

A. That Defendant be ordered to cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

B. That this Court enter judgment against Defendant in an amount equal to treble (three times) the damages the Government has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000 and not more than $23,607, as adjusted by the Federal Civil

Penalties Inflation Adjustment Act of 1990… plus three times the amount of damages which the Government sustains because of the act of that person;

C. That the Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the FCA;

D. That the Relator and her attorney(s) and the Government be awarded all costs of this action, including attorneys' fees and expenses; and

E. That the Relator be awarded such other and further relief as this Court may deem just and proper.

**XI. JURY DEMAND**

Relator, on behalf of the United States, demands a trial by jury on all issues so triable.

Dated: October 19, 2023

By: /s/ David J. Chizewer
David J. Chizewer
david.chizewer@goldbergkohn.com
Rachel C. Steiner
rachel.steiner@goldbergkohn.com
GOLDBERG KOHN LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois 60603
Telephone: (312) 201-4000

*Local Counsel for Plaintiff/Relator*

By: /s/ Rachel Veronica Rose
Rachel Veronica Rose
Texas Bar No. 24074982
rvrose@rvrose.com
RACHEL V. ROSE – ATTORNEY AT LAW, PLLC
P.O. Box 22718
Houston, Texas 77227
Telephone: (713) 907-7442
***Pro Hac Vice Forthcoming***

*Primary Counsel for Plaintiff/Relator*

By: /s/ Jason Zuckerman
Jason Zuckerman
D.C. Bar No. 473649
jzuckerman@zuckermanlaw.com
ZUCKERMAN LAW
1629 K Street, N.W.
Suite 300
Washington, DC 20006
Telephone: (202) 262-895
***Pro Hac Vice Forthcoming***

*Primary Counsel for Plaintiff/Relator*

# Exhibit 1

**ADM Contracts Prime Award 2013 -2023 (SEALED)**

| award_id_piid | total_obligated _amount | period_of_performance _start_date | awarding_agency_ name |
|---|---|---|---|
| 123J1423C1338 | $ 360,990 | 5/11/2023 | Department of Agriculture |
| 123J1423C1332 | $ 47,021 | 5/11/2023 | Department of Agriculture |
| 123J1423C1331 | $ 165,042 | 5/11/2023 | Department of Agriculture |
| 123J1423C1330 | $ 594,918 | 5/11/2023 | Department of Agriculture |
| 121NTB23C0093 | $ 17,001,255 | 4/26/2023 | Department of Agriculture |
| 121NTP23C0239 | $ 178,972 | 4/18/2023 | Department of Agriculture |
| 121NTP23C0196 | $ 890,655 | 3/22/2023 | Department of Agriculture |
| 123J1423C0901 | $ 32,580 | 2/28/2023 | Department of Agriculture |
| 123J1423C0900 | $ 526,050 | 2/28/2023 | Department of Agriculture |
| 123J1423C0895 | $ 305,433 | 2/28/2023 | Department of Agriculture |
| 121NTB23C0063 | $ 21,419,640 | 2/6/2023 | Department of Agriculture |
| 121NTB23C0062 | $ 11,469,521 | 2/6/2023 | Department of Agriculture |
| 121NTB23C0060 | $ 27,831,188 | 2/3/2023 | Department of Agriculture |
| 121NTP23C0133 | $ 408,221 | 2/2/2023 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| 121NTB23C0026 | $ | 11,486,414 | 1/12/2023 | Department of Agriculture |
| 121NTB23C0024 | $ | 3,405,400 | 1/12/2023 | Department of Agriculture |
| 121NTP23C0038 | $ | 199,190 | 12/6/2022 | Department of Agriculture |
| 123J1423C0245 | $ | 265,410 | 11/18/2022 | Department of Agriculture |
| 123J1423C0230 | $ | 115,196 | 11/18/2022 | Department of Agriculture |
| 123J1423C0229 | $ | 101,093 | 11/18/2022 | Department of Agriculture |
| 123J1423C0228 | $ | 749,633 | 11/18/2022 | Department of Agriculture |
| 121NTP22C0411 | $ | 315,622 | 9/8/2022 | Department of Agriculture |
| 121NTB22C0185 | $ | 25,549,093 | 8/17/2022 | Department of Agriculture |
| 121NTB22C0179 | $ | 7,801,986 | 8/10/2022 | Department of Agriculture |
| 121NTB22C0177 | $ | 17,597,745 | 8/10/2022 | Department of Agriculture |
| 121NTB22C0176 | $ | 4,765,518 | 8/10/2022 | Department of Agriculture |
| 123J1422C1996 | $ | 263,138 | 8/4/2022 | Department of Agriculture |
| 123J1422C1995 | $ | 417,992 | 8/4/2022 | Department of Agriculture |
| 123J1422C1983 | $ | 493,461 | 8/4/2022 | Department of Agriculture |
| 121NTB22C0157 | $ | 16,538,790 | 7/27/2022 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| 121NTB22C0156 | $ | 15,032,217 | 7/27/2022 | Department of Agriculture |
| 121NTB22C0147 | $ | 3,258,000 | 6/29/2022 | Department of Agriculture |
| 121NTP22C0267 | $ | 193,176 | 6/1/2022 | Department of Agriculture |
| 123J1422C1469 | $ | 539,937 | 5/12/2022 | Department of Agriculture |
| 121NTP22C0249 | $ | 1,815,000 | 5/3/2022 | Department of Agriculture |
| 121NTB22C0077 | $ | 8,402,859 | 3/9/2022 | Department of Agriculture |
| 123J1422C1064 | $ | 145,238 | 2/18/2022 | Department of Agriculture |
| 123J1422C1060 | $ | 1,101,263 | 2/18/2022 | Department of Agriculture |
| 123J1422C1059 | $ | 346,343 | 2/18/2022 | Department of Agriculture |
| 121NTB22C0029 | $ | 15,268,676 | 1/27/2022 | Department of Agriculture |
| 121NTB22C0024 | $ | 17,924,262 | 1/20/2022 | Department of Agriculture |
| 121NTB22C0012 | $ | 16,656,000 | 1/5/2022 | Department of Agriculture |
| 121NTB22C0003 | $ | 3,408,000 | 10/14/2021 | Department of Agriculture |
| 121NTB21C0365 | $ | 11,285,627 | 9/17/2021 | Department of Agriculture |
| 123J1421C2236 | $ | 13,500 | 8/13/2021 | Department of Agriculture |
| 123J1421C2235 | $ | 430,763 | 8/13/2021 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| 123J1421C2234 | $ | 283,500 | 8/13/2021 | Department of Agriculture |
| 121NTB21C0308 | $ | 13,630,117 | 8/26/2021 | Department of Agriculture |
| 121NTP21C0444 | $ | 213,655 | 8/17/2021 | Department of Agriculture |
| 121NTB21C0218 | $ | 14,091,000 | 7/2/2021 | Department of Agriculture |
| W912EK21P0033 | $ | 9,020 | 3/24/2021 | Department of Defense |
| 123J1421C1486 | $ | 37,080 | 5/14/2021 | Department of Agriculture |
| 121NTP21C0276 | $ | 239,310 | 5/18/2021 | Department of Agriculture |
| 121NTB21C0153 | $ | 18,421,600 | 5/20/2021 | Department of Agriculture |
| 121NTB21C0119 | $ | 12,392,000 | 4/22/2021 | Department of Agriculture |
| 121NTB21C0118 | $ | 6,010,620 | 4/20/2021 | Department of Agriculture |
| 121NTB21C0117 | $ | 5,651,000 | 4/20/2021 | Department of Agriculture |
| 121NTB21C0009 | $ | 1,529,120 | 11/4/2020 | Department of Agriculture |
| 121NTB21C0008 | $ | 1,292,710 | 11/4/2020 | Department of Agriculture |
| 121NTB20C0341 | $ | 8,354,488 | 9/9/2020 | Department of Agriculture |
| 123J1420C2944 | $ | 168,885 | 8/13/2020 | Department of Agriculture |
| 121NTB20C0313 | $ | 3,336,580 | 8/27/2020 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| 121NTB20C0297 | $ | 3,317,850 | 8/20/2020 | Department of Agriculture |
| 121NTB20C0234 | $ | 7,103,052 | 7/30/2020 | Department of Agriculture |
| 121NTB20C0227 | $ | 7,094,790 | 7/24/2020 | Department of Agriculture |
| 121NTB20C0184 | $ | 9,655,991 | 6/10/2020 | Department of Agriculture |
| 121NTP20C0274 | $ | 667,218 | 6/2/2020 | Department of Agriculture |
| 121NTP20C0217 | $ | 719,754 | 5/19/2020 | Department of Agriculture |
| 121NTB20C0148 | $ | 7,281,334 | 5/7/2020 | Department of Agriculture |
| 121NTP20C0203 | $ | 122,323 | 5/5/2020 | Department of Agriculture |
| 121NTB20C0126 | $ | 9,952,787 | 4/24/2020 | Department of Agriculture |
| 121NTB20C0068 | $ | 9,886,770 | 2/13/2020 | Department of Agriculture |
| 123J1420C0311 | $ | 357,390 | 11/21/2019 | Department of Agriculture |
| 123J1420C0310 | $ | 182,799 | 11/21/2019 | Department of Agriculture |
| 121NTB18C0149 | $ | 5,387,798 | 5/10/2018 | Department of Agriculture |
| 123J1418C1282 | $ | 233,955 | 5/24/2018 | Department of Agriculture |
| 123J1418C1279 | $ | 195,993 | 5/24/2018 | Department of Agriculture |
| 123J1418C1281 | $ | 332,316 | 5/24/2018 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| 123J1418C1280 | $ | 160,290 | 5/24/2018 | Department of Agriculture |
| 123J1418C1283 | $ | 8,172 | 5/24/2018 | Department of Agriculture |
| 12653818F0031 | $ | 11,629 | 5/29/2018 | Department of Agriculture |
| 12653818F0034 | $ | 11,407 | 6/5/2018 | Department of Agriculture |
| 121NTB18C0177 | $ | 4,547,000 | 6/13/2018 | Department of Agriculture |
| 12653818F0041 | $ | 10,061 | 7/11/2018 | Department of Agriculture |
| 123J1418C1697 | $ | 346,788 | 7/26/2018 | Department of Agriculture |
| 123J1418C1696 | $ | 50,576 | 7/26/2018 | Department of Agriculture |
| 123J1418C1698 | $ | 126,878 | 7/26/2018 | Department of Agriculture |
| 123J1418C1695 | $ | 339,093 | 7/26/2018 | Department of Agriculture |
| 12653818F0043 | $ | 10,442 | 8/1/2018 | Department of Agriculture |
| 12653818F0049 | $ | 36,000 | 9/7/2018 | Department of Agriculture |
| 121NTB18C0390 | $ | 2,361,600 | 9/21/2018 | Department of Agriculture |
| 123J1419C1689 | $ | 165,186 | 5/16/2019 | Department of Agriculture |
| 123J1419C1690 | $ | 63,000 | 5/16/2019 | Department of Agriculture |
| 123J1419C1688 | $ | 308,655 | 5/16/2019 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| 123J1419C1687 | $ | 143,438 | 5/16/2019 | Department of Agriculture |
| 121NTB19C0147 | $ | 10,642,500 | 6/13/2019 | Department of Agriculture |
| 121NTP19C0288 | $ | 1,807,500 | 6/18/2019 | Department of Agriculture |
| 121NTP19C0293 | $ | 1,108,486 | 6/18/2019 | Department of Agriculture |
| 121NTB19C0209 | $ | 9,258,127 | 7/25/2019 | Department of Agriculture |
| 123J1419C2369 | $ | 45,045 | 8/1/2019 | Department of Agriculture |
| 123J1419C2367 | $ | 184,437 | 8/1/2019 | Department of Agriculture |
| 123J1419C2370 | $ | 39,806 | 8/1/2019 | Department of Agriculture |
| 123J1419C2368 | $ | 117,351 | 8/1/2019 | Department of Agriculture |
| 121NTP19C0352 | $ | 605,950 | 8/6/2019 | Department of Agriculture |
| 121NTB19C0305 | $ | 12,297,656 | 9/18/2019 | Department of Agriculture |
| 121NTB19C0311 | $ | 8,593,203 | 9/19/2019 | Department of Agriculture |
| 121NTB19C0306 | $ | 3,840,496 | 9/18/2019 | Department of Agriculture |
| 121NTP18P0069 | $ | 63,444 | 12/8/2017 | Department of Agriculture |
| 121NTP19C0230 | $ | 92,165 | 4/16/2019 | Department of Agriculture |
| 123J1419C0944 | $ | 153,576 | 2/21/2019 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| 123J1419C0943 | $ | 80,150 | 2/21/2019 | Department of Agriculture |
| 123J1419C0942 | $ | 142,299 | 2/21/2019 | Department of Agriculture |
| 123J1419C0941 | $ | 381,078 | 2/21/2019 | Department of Agriculture |
| 121NTP19C0168 | $ | 148,550 | 3/5/2019 | Department of Agriculture |
| 121NTP19C0159 | $ | 317,851 | 2/20/2019 | Department of Agriculture |
| 121NTB18C0381 | $ | 4,127,747 | 9/6/2018 | Department of Agriculture |
| 12653819F0011 | $ | 26,960 | 12/18/2018 | Department of Agriculture |
| 123J1419C0219 | $ | 170,505 | 11/1/2018 | Department of Agriculture |
| 123J1419C0218 | $ | 286,457 | 11/1/2018 | Department of Agriculture |
| 12653819F0003 | $ | 40,778 | 10/11/2018 | Department of Agriculture |
| 12653818D0003 | $ | - | 4/4/2018 | Department of Agriculture |
| 121NTP18P0159 | $ | 191,990 | 2/6/2018 | Department of Agriculture |
| 121NTP18C0347 | $ | 455,980 | 5/1/2018 | Department of Agriculture |
| 121NTP18C0335 | $ | 1,191,568 | 4/19/2018 | Department of Agriculture |
| 121NTP18C0336 | $ | 426,389 | 4/19/2018 | Department of Agriculture |
| 121NTP18C0334 | $ | 927,415 | 4/19/2018 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| 12653818F0024 | $ | 12,035 | 4/9/2018 | Department of Agriculture |
| 121NTB18C0137 | $ | 4,592,640 | 4/3/2018 | Department of Agriculture |
| 121NTP18P0259 | $ | 177,551 | 3/21/2018 | Department of Agriculture |
| 121NTP18P0223 | $ | 277,562 | 3/12/2018 | Department of Agriculture |
| 121NTB18P0100 | $ | 7,484,000 | 3/8/2018 | Department of Agriculture |
| 121NTB18P0101 | $ | 3,405,220 | 3/8/2018 | Department of Agriculture |
| 121NTP18P0198 | $ | 132,936 | 2/22/2018 | Department of Agriculture |
| 123J1418P0639 | $ | 110,435 | 2/1/2018 | Department of Agriculture |
| 123J1418P0640 | $ | 100,935 | 2/1/2018 | Department of Agriculture |
| 123J1418P0638 | $ | 112,860 | 2/1/2018 | Department of Agriculture |
| AGINTPP160599 | $ | 110,032 | 8/16/2016 | Department of Agriculture |
| AGINTPP160598 | $ | 57,046 | 8/16/2016 | Department of Agriculture |
| AGINTPP160568 | $ | 610,192 | 7/20/2016 | Department of Agriculture |
| AGINTPP160431 | $ | 182,913 | 4/19/2016 | Department of Agriculture |
| AGINTPP160430 | $ | 369,646 | 4/19/2016 | Department of Agriculture |
| AGINTPP160423 | $ | 289,912 | 4/19/2016 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| AGINTPP160361 | $ | 75,196 | 3/15/2016 | Department of Agriculture |
| AGINTPP160345 | $ | 77,640 | 3/15/2016 | Department of Agriculture |
| AGINTPP160344 | $ | 122,040 | 3/15/2016 | Department of Agriculture |
| AGINTPP160342 | $ | 49,070 | 3/15/2016 | Department of Agriculture |
| AGINTPP160341 | $ | 46,410 | 3/15/2016 | Department of Agriculture |
| AGINTPP160339 | $ | 333,200 | 3/15/2016 | Department of Agriculture |
| AGINTPP160295 | $ | 366,336 | 2/17/2016 | Department of Agriculture |
| AGINTPP160248 | $ | 104,320 | 2/3/2016 | Department of Agriculture |
| AGINTPP160100 | $ | 79,800 | 12/3/2015 | Department of Agriculture |
| AGINTPP160096 | $ | 504,188 | 11/17/2015 | Department of Agriculture |
| AGINTPP160095 | $ | 503,606 | 11/17/2015 | Department of Agriculture |
| AGINTPP160067 | $ | 682,074 | 11/3/2015 | Department of Agriculture |
| AGINTPP160066 | $ | 682,870 | 11/3/2015 | Department of Agriculture |
| AGINTPP160065 | $ | 152,757 | 11/3/2015 | Department of Agriculture |
| AGINTPP150422 | $ | 47,196 | 8/18/2015 | Department of Agriculture |
| AGINTPP150412 | $ | 579,869 | 8/4/2015 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| AGINTPP150411 | $ | 274,260 | 8/4/2015 | Department of Agriculture |
| AGINTPP150410 | $ | 200,147 | 8/4/2015 | Department of Agriculture |
| AGINTPP150371 | $ | 259,163 | 7/14/2015 | Department of Agriculture |
| AGINTPP150370 | $ | 517,806 | 7/14/2015 | Department of Agriculture |
| AGINTPP150369 | $ | 922,615 | 7/14/2015 | Department of Agriculture |
| AGINTPP150320 | $ | 431,874 | 6/2/2015 | Department of Agriculture |
| AGINTPP150319 | $ | 423,486 | 6/2/2015 | Department of Agriculture |
| AGINTPP150318 | $ | 987,441 | 6/2/2015 | Department of Agriculture |
| AGINTPP150317 | $ | 1,407,692 | 6/2/2015 | Department of Agriculture |
| AGINTPP150298 | $ | 529,720 | 5/20/2015 | Department of Agriculture |
| AGINTPP150281 | $ | 308,085 | 5/5/2015 | Department of Agriculture |
| AGINTPP150257 | $ | 792,889 | 4/21/2015 | Department of Agriculture |
| AGINTPP150110 | $ | 46,246 | 1/6/2015 | Department of Agriculture |
| AGINTPP150102 | $ | 87,773 | 12/17/2014 | Department of Agriculture |
| AGINTPP150057 | $ | 276,330 | 11/19/2014 | Department of Agriculture |
| AGINTPP150056 | $ | 552,048 | 11/19/2014 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| AGINTPP150049 | $ | 81,227 | 11/19/2014 | Department of Agriculture |
| AGINTBP150061 | $ | 2,992,500 | 9/10/2015 | Department of Agriculture |
| AGINTBP150047 | $ | 4,752,860 | 6/25/2015 | Department of Agriculture |
| AGINTBP150046 | $ | 2,230,300 | 6/18/2015 | Department of Agriculture |
| AGINTBP150043 | $ | 2,495,900 | 6/3/2015 | Department of Agriculture |
| AGINTBP150040 | $ | 4,565,950 | 5/21/2015 | Department of Agriculture |
| AGINTBP150034 | $ | 4,081,275 | 5/17/2015 | Department of Agriculture |
| AGINTBP150032 | $ | 11,455,184 | 5/6/2015 | Department of Agriculture |
| AGINTBP150026 | $ | 12,336,270 | 3/27/2015 | Department of Agriculture |
| AGINTBP150019 | $ | 7,398,480 | 2/19/2015 | Department of Agriculture |
| AGINTBP150018 | $ | 3,219,394 | 2/19/2015 | Department of Agriculture |
| AGINTBP150017 | $ | 7,076,208 | 2/11/2015 | Department of Agriculture |
| AGINTBP140083 | $ | 11,315,730 | 8/28/2014 | Department of Agriculture |
| AGINTBP140068 | $ | 1,524,300 | 7/17/2014 | Department of Agriculture |
| AGINTBP140066 | $ | 3,752,400 | 7/16/2014 | Department of Agriculture |
| AGINTBP140064 | $ | 3,067,968 | 6/26/2014 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| AGINTBP140063 | $ | 4,944,940 | 6/19/2014 | Department of Agriculture |
| AGINTBP140055 | $ | 2,556,900 | 4/24/2014 | Department of Agriculture |
| AGINTBP140054 | $ | 2,803,825 | 4/17/2014 | Department of Agriculture |
| AGINTBP140048 | $ | 15,114,955 | 4/3/2014 | Department of Agriculture |
| AGINTBP140036 | $ | 4,939,480 | 2/27/2014 | Department of Agriculture |
| AGINTBP140034 | $ | 5,012,703 | 2/20/2014 | Department of Agriculture |
| AGINTBP140030 | $ | 3,250,047 | 2/6/2014 | Department of Agriculture |
| AGINTBP140021 | $ | 5,679,623 | 12/19/2013 | Department of Agriculture |
| AGINTBP140008 | $ | 761,967 | 11/7/2013 | Department of Agriculture |
| AGINTBP140001 | $ | 9,201,788 | 10/31/2013 | Department of Agriculture |
| AGINTBP130067 | $ | 15,286,329 | 8/29/2013 | Department of Agriculture |
| AGINTBP130052 | $ | 4,881,000 | 6/20/2013 | Department of Agriculture |
| AGINTBP130051 | $ | 4,032,248 | 6/20/2013 | Department of Agriculture |
| AGINTBP130038 | $ | 12,574,959 | 5/15/2013 | Department of Agriculture |
| AGINTBP130037 | $ | 3,472,770 | 4/10/2013 | Department of Agriculture |
| AGINTBP130018 | $ | 13,555,521 | 1/24/2013 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| AGINAGS150027 | $ | 2,495,900 | 6/3/2015 | Department of Agriculture |
| 121NTB23C0271 | $ | 11,045,234 | 8/29/2023 | Department of Agriculture |
| 123J1423C1946 | $ | 390,546 | 7/27/2023 | Department of Agriculture |
| 123J1423C1941 | $ | 63,216 | 7/27/2023 | Department of Agriculture |
| 121NTB23C0216 | $ | 17,594,655 | 7/26/2023 | Department of Agriculture |
| AGDPROP160601 | $ | 9,927 | 8/18/2016 | Department of Agriculture |
| AGDPROP160493 | $ | 92,772 | 8/4/2016 | Department of Agriculture |
| AGDPROP160492 | $ | 288,986 | 8/4/2016 | Department of Agriculture |
| AGDPROP160318 | $ | 42,750 | 5/12/2016 | Department of Agriculture |
| AGDPROP160317 | $ | 639,243 | 5/12/2016 | Department of Agriculture |
| AGDPROP160316 | $ | 486,000 | 5/12/2016 | Department of Agriculture |
| AGDPROP160266 | $ | 193,860 | 3/31/2016 | Department of Agriculture |
| AGDPROP160245 | $ | 7,920 | 3/1/2016 | Department of Agriculture |
| AGDPROP160175 | $ | 308,957 | 2/4/2016 | Department of Agriculture |
| AGDPROP160174 | $ | 55,535 | 2/4/2016 | Department of Agriculture |
| AGDPROP150516 | $ | 26,501 | 9/3/2015 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| AGDPROP150301 | $ | 580,554 | 6/3/2015 | Department of Agriculture |
| AGDPROP150300 | $ | 194,684 | 6/3/2015 | Department of Agriculture |
| AGDPROP150164 | $ | 170,294 | 2/19/2015 | Department of Agriculture |
| AGDPROP150163 | $ | 100,287 | 2/19/2015 | Department of Agriculture |
| AGDPROP150048 | $ | 106,029 | 11/14/2014 | Department of Agriculture |
| AGDPROP150047 | $ | 122,499 | 11/14/2014 | Department of Agriculture |
| AGDPROP1500049 | $ | 72,072 | 11/14/2014 | Department of Agriculture |
| AGDPROP140480 | $ | 10,418 | 8/21/2014 | Department of Agriculture |
| AGDPROP140479 | $ | 385,668 | 8/21/2014 | Department of Agriculture |
| AGDPROP140478 | $ | 7,664 | 8/21/2014 | Department of Agriculture |
| AGDPROP140477 | $ | 200,700 | 8/21/2014 | Department of Agriculture |
| AGDPROP140309 | $ | 22,635 | 6/5/2014 | Department of Agriculture |
| AGDPROP140308 | $ | 60,750 | 6/5/2014 | Department of Agriculture |
| AGDPROP140167 | $ | 82,008 | 2/20/2014 | Department of Agriculture |
| AGDPROP140166 | $ | 49,654 | 2/20/2014 | Department of Agriculture |
| AGDPROP140123 | $ | 11,569 | 1/15/2014 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| AGDPROP140041 | $ | 10,560 | 11/22/2013 | Department of Agriculture |
| AGDPROP140016 | $ | 60,458 | 11/15/2013 | Department of Agriculture |
| AGDPROP130460 | $ | 10,904 | 8/16/2013 | Department of Agriculture |
| AGDPROP130459 | $ | 47,485 | 8/16/2013 | Department of Agriculture |
| AGDPROP130458 | $ | 211,860 | 8/16/2013 | Department of Agriculture |
| AGDPROP130324 | $ | 47,062 | 6/3/2013 | Department of Agriculture |
| AGDPROP130218 | $ | 26,938 | 2/21/2013 | Department of Agriculture |
| AGDPROP130199 | $ | 137,400 | 2/14/2013 | Department of Agriculture |
| AGDPROP130198 | $ | 37,710 | 2/14/2013 | Department of Agriculture |
| AGDPROP130197 | $ | 8,996 | 2/14/2013 | Department of Agriculture |
| AGINTPP150036 | $ | 833,437 | 11/5/2014 | Department of Agriculture |
| AGINTPP150035 | $ | 928,037 | 11/5/2014 | Department of Agriculture |
| AGINTPP150034 | $ | 241,172 | 11/5/2014 | Department of Agriculture |
| AGINTPP150033 | $ | 425,550 | 11/5/2014 | Department of Agriculture |
| AGINTPP140442 | $ | 247,993 | 7/30/2014 | Department of Agriculture |
| AGINTPP140413 | $ | 249,110 | 7/1/2014 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| AGINTPP140381 | $ | 389,450 | 6/3/2014 | Department of Agriculture |
| AGINTPP140380 | $ | 361,620 | 6/3/2014 | Department of Agriculture |
| AGINTPP140353 | $ | 79,948 | 5/27/2014 | Department of Agriculture |
| AGINTPP140232 | $ | 3,807,620 | 3/20/2014 | Department of Agriculture |
| AGINTPP140225 | $ | 129,968 | 3/20/2014 | Department of Agriculture |
| AGINTPP140224 | $ | 1,117,261 | 3/20/2014 | Department of Agriculture |
| AGINTPP140211 | $ | 420,772 | 3/4/2014 | Department of Agriculture |
| AGINTPP140166 | $ | 235,618 | 2/6/2014 | Department of Agriculture |
| AGINTPP140156 | $ | 691,825 | 2/6/2014 | Department of Agriculture |
| AGINTPP140155 | $ | 1,035,679 | 2/6/2014 | Department of Agriculture |
| AGINTPP140143 | $ | 186,919 | 1/28/2014 | Department of Agriculture |
| AGINTPP140137 | $ | 1,891,814 | 1/23/2014 | Department of Agriculture |
| AGINTPP140126 | $ | 456,408 | 1/10/2014 | Department of Agriculture |
| AGINTPP140125 | $ | 164,585 | 1/10/2014 | Department of Agriculture |
| AGINTPP140092 | $ | 56,685 | 12/17/2013 | Department of Agriculture |
| AGINTPP140073 | $ | 203,000 | 12/3/2013 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| AGINTPP140070 | $ | 237,035 | 12/3/2013 | Department of Agriculture |
| AGINTPP140040 | $ | 222,248 | 11/19/2013 | Department of Agriculture |
| AGINTPP140024 | $ | 482,643 | 11/5/2013 | Department of Agriculture |
| AGINTPP140023 | $ | 1,025,880 | 11/5/2013 | Department of Agriculture |
| AGINTPP140001 | $ | 18,160 | 10/25/2013 | Department of Agriculture |
| AGINTPP130537 | $ | 831,832 | 9/19/2013 | Department of Agriculture |
| AGINTPP130527 | $ | 1,524,315 | 9/5/2013 | Department of Agriculture |
| AGINTPP130467 | $ | 146,318 | 8/6/2013 | Department of Agriculture |
| AGINTPP130466 | $ | 136,163 | 8/6/2013 | Department of Agriculture |
| AGINTPP130453 | $ | 419,553 | 7/24/2013 | Department of Agriculture |
| AGINTPP130450 | $ | 149,737 | 7/24/2013 | Department of Agriculture |
| AGINTPP130412 | $ | 377,268 | 7/9/2013 | Department of Agriculture |
| AGINTPP130411 | $ | 378,937 | 7/9/2013 | Department of Agriculture |
| AGINTPP130408 | $ | 2,141,798 | 7/9/2013 | Department of Agriculture |
| AGINTPP130397 | $ | 75,078 | 6/18/2013 | Department of Agriculture |
| AGINTPP130358 | $ | 1,472,734 | 5/15/2013 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| AGINTPP130319 | $ | 238,880 | 4/2/2013 | Department of Agriculture |
| AGINTPP130265 | $ | 60,929 | 3/7/2013 | Department of Agriculture |
| AGINTPP130264 | $ | 118,773 | 3/7/2013 | Department of Agriculture |
| AGINTPP130263 | $ | 305,774 | 3/7/2013 | Department of Agriculture |
| AGINTPP130250 | $ | 201,170 | 3/5/2013 | Department of Agriculture |
| AGINTPP130249 | $ | 437,357 | 3/5/2013 | Department of Agriculture |
| AGINTPP130248 | $ | 753,130 | 3/5/2013 | Department of Agriculture |
| AGINTPP130247 | $ | 1,523,123 | 3/5/2013 | Department of Agriculture |
| AGINTPP130245 | $ | 438,638 | 3/5/2013 | Department of Agriculture |
| AGINTPP130224 | $ | 58,600 | 2/20/2013 | Department of Agriculture |
| AGINTPP130191 | $ | 1,607,409 | 2/5/2013 | Department of Agriculture |
| AGINTPP130171 | $ | 125,390 | 1/9/2013 | Department of Agriculture |
| AGINTPP130170 | $ | 360,931 | 1/9/2013 | Department of Agriculture |
| AGINTPP130151 | $ | 2,303,652 | 1/10/2013 | Department of Agriculture |
| AGINTBP170001 | $ | 6,873,800 | 10/13/2016 | Department of Agriculture |
| AGINTBP160144 | $ | 3,663,000 | 8/4/2016 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| AGINTBP160087 | $ | 3,488,000 | 4/28/2016 | Department of Agriculture |
| AGINTBP160060 | $ | 6,096,770 | 3/3/2016 | Department of Agriculture |
| AGINTBP160058 | $ | 5,819,920 | 2/18/2016 | Department of Agriculture |
| AGINTBP160018 | $ | 14,441,376 | 12/10/2015 | Department of Agriculture |
| AGINTBP160008 | $ | 4,355,683 | 11/4/2015 | Department of Agriculture |
| AGINTBP160007 | $ | 1,268,980 | 10/29/2015 | Department of Agriculture |
| AGINTBP160002 | $ | 4,315,200 | 10/15/2015 | Department of Agriculture |
| AGINTBP160001 | $ | 7,845,240 | 10/15/2015 | Department of Agriculture |
| AG6538P170156 | $ | 8,278 | 5/1/2017 | Department of Agriculture |
| AG6538P170035 | $ | 11,148 | 12/8/2016 | Department of Agriculture |
| AG6538P160297 | $ | 8,590 | 9/2/2016 | Department of Agriculture |
| AG6538P160245 | $ | 35,218 | 7/27/2016 | Department of Agriculture |
| AG6538P160090 | $ | 9,700 | 2/11/2016 | Department of Agriculture |
| AG6538P160014 | $ | 7,553 | 10/29/2015 | Department of Agriculture |
| AG6538P150135 | $ | 42,175 | 4/15/2015 | Department of Agriculture |
| AG6538P150066 | $ | 8,284 | 1/30/2015 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| 12653818P0072 | $ | 9,966 | 1/12/2018 | Department of Agriculture |
| 12653818P0016 | $ | 9,731 | 10/23/2017 | Department of Agriculture |
| 123J1418P0146 | $ | 28,260 | 11/2/2017 | Department of Agriculture |
| 123J1418P0145 | $ | 37,390 | 11/2/2017 | Department of Agriculture |
| 123J1418P0143 | $ | 175,860 | 11/2/2017 | Department of Agriculture |
| 123J1417P1675 | $ | 190,323 | 7/20/2017 | Department of Agriculture |
| 123J1417P1674 | $ | 51,489 | 7/20/2017 | Department of Agriculture |
| 123J1417P1673 | $ | 445,554 | 7/20/2017 | Department of Agriculture |
| 123J1417P1672 | $ | 126,796 | 7/20/2017 | Department of Agriculture |
| 123J1417P1049 | $ | 133,029 | 4/27/2017 | Department of Agriculture |
| 123J1417P1048 | $ | 50,589 | 4/27/2017 | Department of Agriculture |
| 123J1417P1047 | $ | 366,530 | 4/27/2017 | Department of Agriculture |
| 123J1417P1046 | $ | 447,093 | 4/27/2017 | Department of Agriculture |
| 123J1417P0648 | $ | 68,013 | 2/2/2017 | Department of Agriculture |
| 123J1417P0647 | $ | 117,180 | 2/2/2017 | Department of Agriculture |
| 123J1417P0646 | $ | 267,624 | 2/2/2017 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| 123J1417P0645 | $ | 178,655 | 2/2/2017 | Department of Agriculture |
| 123J1417P0130 | $ | 18,144 | 11/9/2016 | Department of Agriculture |
| 121NTP18P0049 | $ | 296,024 | 11/15/2017 | Department of Agriculture |
| 121NTP18P0048 | $ | 935,777 | 11/15/2017 | Department of Agriculture |
| 121NTP17P0450 | $ | 684,790 | 9/21/2017 | Department of Agriculture |
| 121NTP17P0378 | $ | 243,870 | 7/20/2017 | Department of Agriculture |
| 121NTP17P0367 | $ | 40,031 | 7/11/2017 | Department of Agriculture |
| 121NTP17P0365 | $ | 1,542,876 | 6/7/2017 | Department of Agriculture |
| 121NTP17P0348 | $ | 30,800 | 5/17/2017 | Department of Agriculture |
| 121NTP17P0328 | $ | 57,118 | 4/18/2017 | Department of Agriculture |
| 121NTP17P0282 | $ | 590,308 | 3/1/2017 | Department of Agriculture |
| 121NTP17P0276 | $ | 112,670 | 3/1/2017 | Department of Agriculture |
| 121NTP17P0254 | $ | 275,802 | 2/15/2017 | Department of Agriculture |
| 121NTP17P0249 | $ | 44,105 | 2/15/2017 | Department of Agriculture |
| 121NTP17P0248 | $ | 18,950 | 2/22/2017 | Department of Agriculture |
| 121NTP17P0140 | $ | 201,906 | 1/5/2017 | Department of Agriculture |

| | | | | |
|---|---|---|---|---|
| 121NTP17P0124P0001 | $ | 153,062 | 12/21/2016 | Department of Agriculture |
| 121NTP17P0054 | $ | 241,548 | 11/17/2016 | Department of Agriculture |
| 121NTP17P0013 | $ | 1,201,316 | 11/1/2016 | Department of Agriculture |
| 121NTB17P0222 | $ | 6,719,440 | 9/20/2017 | Department of Agriculture |
| 121NTB17P0184 | $ | 4,485,262 | 8/16/2017 | Department of Agriculture |
| 121NTB17P0152 | $ | 9,016,093 | 8/3/2017 | Department of Agriculture |
| 121NTB17P0150 | $ | 4,666,500 | 7/26/2017 | Department of Agriculture |
| 121NTB17P0149 | $ | 4,806,800 | 7/26/2017 | Department of Agriculture |
| 121NTB17P0130 | $ | 5,425,440 | 6/15/2017 | Department of Agriculture |
| 121NTB17P0129 | $ | 5,404,540 | 6/15/2017 | Department of Agriculture |
| 121NTB17P0048 | $ | 2,775,500 | 2/2/2017 | Department of Agriculture |
| 121NTB17P0040 | $ | 4,708,944 | 1/25/2017 | Department of Agriculture |
| 121NTB17P0038 | $ | 7,582,883 | 1/25/2017 | Department of Agriculture |
| 121NTB17P0023 | $ | 7,606,175 | 1/12/2017 | Department of Agriculture |
| 121NTB17P0022 | $ | 4,472,431 | 1/12/2017 | Department of Agriculture |
| 121NTB17P0010 | $ | 7,900,000 | 12/1/2016 | Department of Agriculture |

| | | |
|---|---|---|
| **TOTAL** | **$** | **861,718,363** |