**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES ex rel. MARK PANNEK.,** | § | |
| | § | |
| **Relator/Plaintiff,** | § | |
| | § | **Case No. 1:23-cv-15145** |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **ARCHER DANIELS MIDLAND COMPANY,** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## RELATOR'S SECOND AMENDED COMPLAINT

## INTRODUCTION

1. For years, Defendant Archer Daniels Midland Company ("ADM") has knowingly failed to remedy persistent and pervasive cybersecurity deficiencies that place at risk sensitive information ADM received pursuant to its government grants and contracts. At the same time, ADM has received significant taxpayer funds. Given the cybersecurity requirements attached to those funds and the magnitude of ADM's cybersecurity failures, government knowledge of such failures would have tended to or been capable of influencing the decision of whether or how much to pay.

2. The contract language and regulations at issue can be complicated, and they are filled with defined terms. Those regulations and defined terms are explained in detail in this complaint.

3. But in broad summary, Relator's allegations are as follows: there is a specific grant at issue in this case, as well as specific contracts. The grant and contracts each contain express contractual terms related to protection of certain categories of data. Those grants and contracts

also have regulatory data protection requirements. The contractual terms and regulatory requirements are described *infra* at ¶¶ 22–39; 42–47; 152–159.

4. Pursuant to government grants and contracts, ADM creates and stores certain categories of data at issue in those requirements. There are generally three overlapping types of information at issue here which ADM had an obligation to protect: Controlled Unclassified Information ("CUI"), Personally Identifiable Information ("PII"), and Climate-Smart Commodities "Protected Information."[1] The types of information ADM stored that is at issue in this case is identified *infra* at ¶¶ 23–34; 48–54; 160–165. How that information meets the definitions of these categories of information is identified *infra* at ¶¶ 23, 34–35, 43.

5. ADM failed to protect this information as the regulations and terms and conditions in these government grants and contracts require. Nevertheless, it promised to do so knowing it would not, and it certified that it had complied with those promises. The representations ADM made are described *infra* at ¶¶ 108–124; 168–175. Those were false, and ADM made those false statements knowingly. The promises and certifications at issue here universally came after ADM was made aware of significant cybersecurity deficiencies through audits and other investigations, as detailed i*nfra* at ¶¶ 188–203.

6. The failure to protect this information it received pursuant to its grants and contracts was neither isolated nor infrequent. ADM's failures were instead widespread and systemic, and ADM has simply not bothered to fix them. These failures relate to direct requirements in each of the grants and contracts identified, as described in detail *infra* at ¶¶ ¶¶ 22–39; 42–47; 152–159.

---

[1] In general: (i) the PII information at issue in this case is also CUI information and Protected Information because of the nature of the PII information; (ii) the Protected Information is also CUI; and (iii) ADM also stores Protected Information and CUI (e.g., farm-specific data that is not necessarily traced to an identity) other than PII.

Given the size and scope of the failures and the nature of the information, detailed *infra* at ¶¶ 55–101, it would be impossible for them not to be capable of influencing a decision maker's decision to award a contract or grant, or to pay or reimburse under one. *See also* ¶¶ 124–154; 176–187.

7. Relator's complaint involves multiple grants and contracts. But Relator begins with the most egregious example: the 2023 Climate-Smart Commodities Grant.

8. Before receiving this grant, ADM had conducted an audit, which identified significant deficiencies in ADM's cybersecurity system related to a vast data lake ingesting data from hundreds of ADM systems daily, including sensitive information like producer names, social security numbers, and other detailed farm information about producers.

9. ADM did not adequately address the issues. It instead did nearly the opposite: it disbanded the group responsible for identifying and remedying the concerns, ADM's Data Governance Office ("DGO").

10. Yet only months after disbanding DGO, and making no significant effort to remedy the deficiencies, ADM applied for and was awarded a massive grant under the USDA's Climate-Smart Commodities Program.

11. Both ADM and USDA recognized the importance and materiality of adequate cybersecurity as to this specific project. ADM's grant contains a project narrative in which ADM defined the project for the grant. In that narrative, ADM acknowledged that "***sharing data can be sensitive*** and onerous proposition for producers." USDA further required a grant-specific promise that ADM would "provide each producer applying for benefits under this grant a description in writing of ***how their information, including but not limited to data about their farm and commodities, will be*** utilized []and, ***protected***. . . . ."

12. ADM also willingly signed on to a promise that it would "***internally restrict access*** to the protected information [including farm information and producer PII] ***to only those individuals who have a demonstrated need to know*** the protected information to perform work under this award."

13. ADM has since sought reimbursement—certifying that it had complied with the terms and applicable regulations, including its demonstrated-need-to-know promise that it was taking "[t]ak[ing] reasonable cybersecurity . . . measures to safeguard information." Public records indicate that it has received approximately $40 million from the federal government based on these certifications.

14. All the while—when applying for the grant, when signing the grant, and when performing under the grant—ADM knew it still employed a vast data lake that continued to be filled with insufficiently protected sensitive information to which ADM had granted extraordinarily excessive access privileges, including information received pursuant to the 2023 Climate-Smart Commodities Grant. ADM also knew its system contained significant other related deficiencies. Indeed, the ***same executive*** who signed the 2023 Climate-Smart Commodities grant had also received the formal audit detailing many of ADM's cybersecurity failures.

15. But ADM hid these facts from the government. It made the identified false promises and certifications instead. This is textbook fraud.

16. This conduct, and ADM's further fraudulent conduct identified below, gives rise to liability under the False Claims Act. Relator further pleads as follows:

## THE PARTIES

17. Relator Mark Pannek is a resident of Ohio. Mr. Pannek is a senior risk management leader with over thirty-five years of experience in technology governance, risk, and compliance. He has held a variety of vice-president level positions with major financial and healthcare

institutions, including JP Morgan Chase, Synchrony Financial f/k/a GE Capital, and U.S. Bank. From October 2018 through May 2023, he served in senior roles within the Information Technology group at ADM, including as Director of Global Data Governance, Risk & Compliance. Relator is an original source of the allegations detailed below which have otherwise not been publicly disclosed.

18. Defendant ADM is a publicly traded company located at 77 West Wacker Drive, Suite 4600, Chicago, Illinois 60601. ADM is a global food processing company and food supply chain manager. ADM works with thousands of farmers throughout the world. It then "uses its integrated global network of elevators, trucks, railcars, barges, and ships to move those crops from areas of supply to areas of demand, and transforms many of those raw commodities into a broad array of products serving customers spanning food, feed, fuel, industrial, and consumer products." 10-K, Fiscal Year 2024.

## <u>JURISDICTION AND VENUE</u>

19. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. §3732.

20. As described herein, this Court has general and specific personal jurisdiction over ADM because ADM's corporate headquarters are located in Illinois and many of the actions complained of herein occurred in Illinois.

21. As described herein, venue in this District is proper under 28 U.S.C. § 1391 at least because a substantial part of the acts or omissions giving rise to this complaint occurred in the District. Venue is proper under 31 U.S.C. § 3732 because ADM resides in, transacts business in, and committed acts which violated the False Claims Act in the District.

## <u>CONTROLLED UNCLASSIFIED INFORMATION</u>

22. The grant and contracts at issue in this case have specific cybersecurity standards. Those standards do not expressly incorporate the relevant CUI regulations, at least not based on public terms. Nevertheless, both the grant and contracts contemplate the generation and storage of CUI. Before proceeding with the specifics on the grant and contracts, Relator briefly explains the relevant CUI regulations and the standard set by those regulations as bare minimum for non-federal entities storing CUI in their systems.

***ADM's Storage of CUI***

23. Controlled Unclassified Information is "information the Government creates or possesses, or that an entity creates or possesses for or on behalf of the Government, that a law, regulation, or Government-wide policy requires or permits an agency to handle using safeguarding or dissemination controls." 32 C.F.R. § 2002.4(h).

24. CUI is broader than only information that a grant recipient or contractor receives from the Government. Instead, the plain language of the regulation encompasses information that "an entity creates or possesses for or on behalf of the Government."

25. The CUI Registry, created via 32 C.F.R. § 2002.1, located at https://www.archives.gov/cui/registry/category-list, identifies Agriculture Information ("AG") as a category of CUI. The Registry defines AG information as "information related to the agricultural operation, farming or conservations practices, or the actual land of an agricultural producer or landowner" (citing 7 U.S.C. § 8791(b)). This is CUI at least because Section 8791(b)—also known as Section 1619 of the Food, Conservation, and Energy Act of 2008 or Section 1619 of the 2008 Farm Bill—broadly prohibits disclosure of "information provided by an agricultural producer or owner of agricultural land concerning the agricultural operation, farming or conservation practices, or the land itself . . . ."

26. The USDA has interpreted the scope of this designation. For example, the General Terms and Conditions applicable to grants awarded by Farm Product and Conservation (FPAC) mission area contains a description of "protected information" as information protected from disclosure under 7 U.S.C. § 8791(b). Types of information "include, but are not limited to, . . . : i. state identification and county number (where reported and where located). ii. Producer or landowner name, business full address, phone number, Social Security Number, and similar personal identifying information. iii. Farm, tract, field, and contract numbers. iv. Production shares and share of acres for each Farm Serial Number (FSN) field. v. Acreage information, including crop codes" as well as other types of information. This description of information protected from dissemination is reflected in all General Award Terms and Conditions for grants awarded by the USDA's Farm Product and Conservation mission area from August 2019 through March 2025.

27. Other relevant categories of CUI identified in the CUI Registry include, General Privacy—defined as "personal information . . . or personally identifiable information'" (citing various statutes, regulations, and agency regulations), General Proprietary Information—defined as "material and information relating to . . . a company's products, business, or activities . . ." (citing various statute, regulations, and agency regulations), and many others.

28. ADM possesses CUI throughout its systems in connection with each of the grants and contracts identified in this complaint.

29. Relator knows based on his personal knowledge that ADM electronically possesses significant information under these definitions. Specifically, ADM possesses information about individual producers and their products, including names, social security numbers, pricing information, and other highly sensitive material.

30. Legal requirements also establish that ADM must create or possess these categories of information of the government. For example, USDA's Master Solicitation Commodity Procurement – Domestic ("MSCP-D") has expressly required contractors since March 2019—the entire relevant period of contracts at issue here—to "make all paperwork available to USDA that confirms 100% domestic origin traceback from the destination to the origin orchard/field/vineyard/farm/etc., including all steps in the process." This information is CUI because it is protected from disclosure under 7 U.S.C. § 8791(b) and is categorized as AG CUI: farm producer PII and acreage information.

31. The FDA also requires ADM to maintain specific, detailed records about its source of food that ADM acquires, stores, and transports—including names, addresses, telephone numbers, and lot numbers. 21 C.F.R. §§ 1.337, 1.345, and 1.352. This is also AG CUI.

32. ADM is also required by law to maintain records related to its commodity-purchase government contracts and its government grants. 48 C.F.R. § 4.703 ("[C]ontractors shall make available records . . . to satisfy contract negotiation, administration, and audit requirements . . . ."); 2 C.F.R. § 200.334 (same as to grants).

33. ADM also possesses specific additional CUI-material based on its significant data gathering responsibilities in the Climate-Smart Commodities Grant. This is discussed *infra* at ¶¶ 48–54.

34. ADM at least "possesses" all of this data "for or on behalf of the Government," as required to meet the regulatory definition of CUI, because ADM's storage of that information is related to a government contract or grant, including that ADM must keep this information to comply with contractual and regulatory requirements.

***ADM's Duties Regarding CUI***

35. "Authorized Holders," like ADM, are required to "take reasonable precautions to guard against unauthorized disclosure of CUI." 32 C.F.R. § 2002.14(c). ADM is an "Authorized Holder" because it is an "organization . . . that is permitted to . . . handle CUI." (Controlled Unclassified Information). 32 C.F.R. § 2002.4(d).

36. Authorized Holders like ADM "must . . . (1) [e]stablish controlled environments in which to protect CUI from unauthorized ***access*** or disclosure . . . [and] (2) [r]easonably ensure that unauthorized individuals cannot ***access or observe*** CUI . . . ." 32 C.F.R. 2002.14 § (c)(1)–(2) (emphasis added). Authorized holders are permitted to reproduce (including electronically duplicate) CUI only "in furtherance of a lawful Government purpose." 32 C.F.R. 2002.14 § (e)(1).

37. The Government requires any system storing CUI to meet at least the standards set forth in NIST SP 800-171. "Agencies must use NIST SP 800-171 when establishing security requirements to protect CUI's confidentiality on non-Federal information systems . . . ." 32 C.F.R. § 2002.14(h)(2).

38. Similarly, the USDA's Controlled Unclassified Information Department Regulation, effective September 13, 2021, requires that the USDA's Chief Information Officer "ensure the Department applies NIST SP 800-171 Revision 2 . . . when establishing security requirements to protect CUI's confidentiality on non-Federal information systems . . . ."[2]

[2] "NIST" is the National Institute of Standard and Technology, a part of the United States Department of Commerce. Through its "800 series" of publications, NIST has developed guidelines, recommendations, and technical specifications for cybersecurity. Parts of the "800 series" govern federal systems, including systems operated outside the Government but "on behalf of" agencies. For example, NIST 800-53 governs mandatory requirements for federal information systems, including information systems operated "on behalf of" federal agencies. NIST 800-53 is a common cybersecurity framework that many companies outside the federal government use to evaluate their own cybersecurity systems. NIST 800-171, however, is designed for non-Federal information systems like ADM.

39. Relator details ADM's cybersecurity deficiencies and how those deficiencies map to the baseline standards set in NIST 800-171 *infra* at ¶¶ 73–101.

## ADM'S FALSE CLAIMS REGARDING CLIMATE-SMART COMMODITIES GRANT

### *Climate-Smart Commodities Cybersecurity Grant Terms*

40. In a March 11, 2022 Notice of Funding Opportunity ("NOFO"), USDA announced the availability of $1 billion in grants funds for the Partnerships for Climate-Smart Commodities grant.

41. As signed, the grant ultimately had three conditions relevant here. The first is from the express terms and conditions governing "Protected Information." The two others are from the express incorporation of regulatory requirements.

*Least Privilege Access to "Protected Information"*

42. From the operative Terms and Conditions, ADM "agree[d] to comply with FPAC guidelines and requirements regarding disclosure of information protected under . . . 7 U.S.C. 8791 as described below." This included a requirement to "internally restrict access to the protected information to only those individuals who have a demonstrated need to know the protected information to perform work under this award," to "use the protected information only to perform work that is directly ed connected to this award," and to notify "all managers, supervisors, employees, contractors, agents, and representatives" about these requirements. Terms and Conditions, November 2022. Those Terms and Conditions also indicate that "***[t]he recipient will be held responsible for violations of this provision***."

43. The Terms and Conditions defined protected information as information that "includes, but [is] not limited to, . . . : i. state identification and county number (where reported and where located). ii. Producer or landowner name, business full address, phone number, Social Security Number, and similar personal identifying information. iii. Farm, tract, field, and contract

numbers. iv. Production shares and share of acres for each Farm Serial Number (FSN) field. v. Acreage information, including crop codes" as well as other types of information.

*Express Incorporation of 2 C.F.R. Part 200 Subpart D: Effective Controls and Reasonable Cybersecurity Measures*

44. Second, the grant expressly incorporates 2 C.F.R. Part 200 Subpart D into its Terms and Conditions. That subpart includes two related requirements.

45. The recipient is required to "take reasonable measures to safeguard protected personally identifiable information and other information the recipient or subrecipient considers sensitive." 2 C.F.R. § 200.303(e). Since October 1, 2024, the recipient warrants to "[t]ake reasonable cybersecurity and other measures to safeguard information including protected personally identifiable information (PII) and other types of information," including information the recipient itself or its subrecipients considers to be sensitive. 2 C.F.R. § 200.303(e). The prime difference is that the regulation in 2024 made explicit what was previously implicit: "reasonable measures to safeguard" include cybersecurity measures.[3]

46. "Protected Personally Identifiable Information (Protected PII) is defined as an "individual's first name or first initial and last name in combination with any one or more of types

[3]The notice-and-comment process related to § 200.303(e) also sheds light on the minimum requirements to provide "reasonable safeguards." Upon notice of expressly including cybersecurity safeguards, "many commenters" across the industry specifically requested that the government revise the rule to expressly "incorporate the requirements of NIST SP 800-53 or other existing frameworks." 89 Fed. Reg. 30046, 30077 (April 22, 2024). These commenters were not in favor of raising the standard. Rather, these commenters suggested that NIST SP 800-53 would "ensure that the internal control requirements are not onerous and a barrier to participation." *Id.* In other words, the NIST 800-53 standards (and, by extension, its less onerous 800-171 counterpart) was considered a bare minimum of what constituted a reasonable safeguard that was "not onerous [or] a barrier to participation." *Id.* Rather than incorporate a specific standard, the government elected to maintain a "reasonable safeguards" requirement. 2 C.F.R. § 200.303(e). Nevertheless, the commentary and government response indicate that the NIST standards are currently considered bare minimum cybersecurity safeguards.

of information, including, but not limited to, social security number, passport number, credit card numbers, clearances, bank numbers, biometrics, date and place of birth, mother's maiden name, criminal, medical and financial records, educational transcripts."

47. Under 2 C.F.R. Part 200 Subpart D, the recipient must also "establish, document, and maintain effective internal control over the Federal award provides reasonable assurance that the recipient . . . in managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award." 2 C.F.R. § 200.303(a). Those controls "should align with the guidance in Standards for International Control in the Federal Government" issued by the Comptroller General of the United States, known as the "Greenbook." *Id.* The standards in the Greenbook, in turn, require that "management should design general control activities over information technology to mitigate risks to achieving the entity's objectives to acceptable levels," Greenbook at Principle 11.01, should "design[] appropriate types of general control activities to mitigate information security risks," *Id.* 11.07, and defines "information security" as "the protection of information . . . to provide confidentiality, integrity, and availability." *Id.* at 11.04.

***Climate-Smart Commodities: What Sensitive Information ADM Stored in Connection with the Grant***

48. ADM generated and stored CUI, PII, Protected Information in connection with this grant.

49. This data is not isolated to only a few farms. Instead, USDA's promotion of ADM's grant project indicates that ADM "will utilize incentive payments to thousands of producers across 15 states," including "5,000 underserved producers."

50. ADM's project narrative concedes it would be generating and storing this data for all of these thousands of farms. ADM recognized that through its partner, FBN, that "Data will be collected from each farm in the program," including "utilizing satellite imagery." Elsewhere, the

projective narrative indicates that "data will be collected from all farms via a production survey" concerning the farm's current and contemplated practices.

51. That grant required ADM to submit quarterly reports to the USDA, including a wide variety of information constituting Protected Information under the grant as well as Protected PII under the C.F.R. Part 200, Subpart D.

52. According to Supplemental Terms and Conditions, the information is gathered "at four levels: project, partner, producer, and field."

53. At the producer level, ADM gathered and shared with USDA Farm IDs, producer name and locations (county and state), whether the producer was an "underserved and/or a small producer," total area, total crop area, total forest area, and total livestock area, whether the farm is organic or whether any fields in the farm are organic, and other material.

54. At the field level, ADM gathered and shared with USDA Farm, Tract, and Field IDs, commodity categories and types at the location, the baseline yield, irrigation types, tillage types, practice types, the value and volume of the commodities produced, and more.

***Climate-Smart Commodities: How ADM Failed to Meet the Requirement of Least Privilege***

55. ADM is one of the oldest publicly traded companies in the United States. The ADM corporate family is the product of dozens of acquisitions over decades, including acquisitions of different companies with different technology systems.

56. ADM has never undertaken the effort to unify its various sources of data into a unified, controllable single system. Instead, ADM has conducted business with a mish-mash of various systems. Because of this, ADM's overall system—its servers, systems, applications, databases, etc.—is located across a myriad of different locations. There is no common ADM footprint. For example, ADM's technological environment includes more than 2,000 applications, thousands of servers, thousands of databases, tens of thousands of data transfers, thousands of third

parties, and various data repositories, Application Programming Interfaces (APIs), and the like. This hyper fragmented environment poses significant difficulties in implementing a policy to safeguard ADM's data.

57. Faced with this difficulty, ADM has chosen simply to accept the grave risk to its data, including data it is storing for or on behalf of the federal government.

58. ADM's most egregious failures are ones that are directly related to its promise "to internally restrict access to the protected information to only those individuals who have a demonstrated need to know the protected information": a vast data lake and pervasive access to shared servers storing sensitive information.

59. Since at least 2018, ADM deployed a vast data lake that ingested data from several hundred disparate applications, including some of ADM's biggest and most data dense. ADM deployed this lake despite internal objections from the acting Chief Information Security Officer at the time the lake was being first implemented.

60. ADM's Global Technology department has essentially ingested all information from these applications into the data lake without any significant efforts being undertaken to specifically identify or secure sensitive information. Ingested data includes information from ADM's Enterprise Resources Planning Platforms as well as its Master Data Management platforms, each of which would have contained personal information about individual farmers as well as information about farm addresses, including information obtained pursuant to the 2023 Climate-Smart Commodities Grant. Given the automatic ingestion of this data, this information was copied multiple times over multiple servers from the multiple applications the data originally came from. While the original Data Architect in charge of the lake initially did his best to manually avoid ingesting sensitive information into the lake, the lake then transitioned to the Data &

Analytics team in Spring 2019. That team made the choice to ingest data from entire applications into the lake as fast as possible without regard to sensitive information.

61. Meanwhile, much of ADM has access to this vast lake of data, including volumes of sensitive data like names, addresses, social security numbers, driver's license numbers, and bank account numbers. Hundreds of individuals have full access to the data in the lake. Many of the individuals with data lake access have no documented reason to have access to any of the sensitive data within it, much less a documented need to have access to *all* such information.

62. These deficiencies applied to data generated or stored in connection with the specific grant. In particular, the structure of the Data Lake comprised ADM's end-to-end business processes, not an isolated system. Based on the structure of ADM's system, the Climate-Smart Commodities Program data could not have been isolated from other data flowing into/through the Data Lake.

63. ADM allowed hundreds of individuals and applications to have unfettered access to this data lake with no documented business justification at all, much less a documented business justification to specific information generated in connection with this specific award. Many of these individuals have database *owner* privileges as well, compounding the security concerns. ADM has given database owner privileges to dozens of non-ADM third-party contractors, many of whom are non-U.S. citizens and located outside the United States. A database owner can do more than simply view data; it can add data, remove data, or manipulate data as well.

64. This issue of sensitive information on shared servers and excessive database-owner privileges was neither limited to the data lake nor was it new to ADM at the time the data lake was implemented. Hundreds of servers have similar issues with voluminous sensitive information

residing on those servers in an unencrypted (at the data level) format, viewable, usable, and modifiable by anyone with privileges.

65. When engaged in an audit of four servers in late 2019 in which such problems were found, a former ADM IT auditor described the findings as not surprising and indicated that these issues were commonplace at ADM. The former auditor also performed ad hoc, random searches to corroborate his views concerning how prevalent the issue of unencrypted, sensitive information on shared servers was at ADM.

66. These other shared servers have not been disabled, and they continue to operate in the background in addition to the data lake.

67. ADM's attempt to control data access was also knowingly deficient. Rather than create a system in which data could be controlled and managed throughout, ADM instead focused on the bare minimum to give the appearance of partial compliance with the regulations it believed were most risky. Instead of implementing defined controls throughout its system, ADM, in its efforts to comply with the Sarbanes Oxley Act, instead implemented controls on only SOX-related applications. SOX information is limited to financial reporting, and ADM's choice to implement its IT General Controls on only SOX-related applications reflects a knowing choice to *not* implement those necessary controls in applications containing other sensitive information, including PII and sensitive information related to federal contracts.

68. For example, servers related to the applications in the Master Data Management Suite, including Party Hub, Place Hub, and Item Hub would have contained data stored for the government, including CUI. Yet these applications were not considered SOX-relevant, and ADM's internal controls were not implemented for them.

69. Compounding these access control issues, ADM fails to adequately centralize its user access decisions. While ADM has a centralized group (Global Information Cyber Security, or GISC), various ADM components establish user privileges outside GISC. This "Shadow IT" has existed throughout the relevant time period, allowing even more users to acquire or maintain excess privileges to access, modify, download, or otherwise use ADM's sensitive data.

70. In light of these circumstances—all of which were known to ADM at the time it applied for, signed, and sought reimbursement under this grant—ADM clearly failed to employ the principle of least privilege as to Protected Information as it promised to do.

***Climate-Smart Commodities: How ADM Failed to Meet the 2 C.F.R. Part 200 Requirements, Incorporated into the Grant.***

71. As discussed, the grant also expressed incorporated 2 C.F.R. Part 200, including the requirements for "effective internal control . . . that provides reasonable assurance that the non-Federal entity is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions," 2 C.F.R. § 200.303(a), and take "reasonable measures to safeguard protected personally identifiable information"—or, after October 1, 2024, "[t]ake reasonable cybersecurity and other measures." *Id.* §200.303(e). The Greenbook, which the controls have to be "in compliance with," also require that the controls to minimize risk to "acceptable levels."

72. The Climate-Smart Commodities grant involved the generation and storage of CUI, including CUI that is also protected personally identifiable information. Because the CUI regulations require NIST 800-171, systems that fail to require NIST 800-171 for this information do not have effective controls to ensure the award is managed in compliance with the Federal CUI regulations. Systems that fail NIST 800-171—particularly in numerous and pervasive ways—also fail to constitute reasonable cybersecurity measures and they fail to reflect controls designed to minimize risk to acceptable levels. The details of ADM's NIST 800-171 failures are below.

*Climate Smart Commodities: How ADM's Cybersecurity Fails NIST 800-171 Least Privilege*

73. In all relevant versions, NIST 800-171 has required systems housing CUI to "[e]mploy the principle of least privilege, including for specific security functions and privileged accounts." *See* 3.1.5, NIST 800-171 (rev 1). ADM's actions detailed above with to the least privilege portion of the Climate-Smart Commodities Terms and Conditions also fail to comply with this provision of NIST 800-171. *See supra* ¶¶ 55–71.

*Climate Smart Commodities: How ADM's Cybersecurity Fails NIST 800-171 Audit Requirements*

74. NIST 800-171 also requires all systems storing CUI to "create, protect, and retain information system audit records to the extent needed to enable monitoring, analysis, investigation, and reporting of unlawful, unauthorized, or inappropriate information system activity." 3.3.1, NIST 800-171. It further requires the system "ensure that the actions of individual information system users can be uniquely traced to those users so they can be held accountable for their actions." 3.3.2, NIST 800-171.

75. ADM has major gaps in its audit records.

76. For example, Relator understands that there was no meaningful auditing of any sensitive data field access in the data lake or any other shared servers. There was also no data-set level access logs for ADM's SQL servers or other shared data servers.

77. Relator understands that such data-set logs might have existed for the data lake. But, in view of the sheer number of datasets and tables, those logs were either frequently disabled, ignored, or both. Even if data-set level access logs existed, much of the data-set information included significant non-sensitive information as well as sensitive information. Due to its lack of sensitive data field access logging, ADM would have no way of knowing whether sensitive data

was accessed or not in a scenario in which an individual user logged into a vast dataset including both sensitive and non-sensitive datafields.

78. Indeed, Relator and his team requested these logs. The requests were repeatedly rejected for stated reasons of both financial cost and performance. Despite the stated reason of performance, the processing impact of employing these logs in the lake would have been no more than milliseconds.

79. The result of this lack of sensitive-data-field access-log is that ADM was not logging what particular information was accessed. A user might have a reasonable basis to access non-sensitive data in a large dataset containing both non-sensitive and sensitive data, but ADM would have no way of knowing whether that user also accessed the sensitive data.

80. The logging of a specific type of server—a Structure Query Language or SQL server— was even more sparse. A SQL server is the server that handles the SQL queries and stores underlying data in the relational database system. At least as of 2019, Mr. Pannek could not obtain a SQL Server Audit log that would have allowed ADM to know who accesses a SQL database, when, from where, and what actions were performed.

81. In general, there was also little to no audit trail for data access in shared data file servers. ADM largely had the technical capability to create Detailed File Access Auditing Logs for these servers. But ADM kept and keeps the vast majority of them disabled. ADM fails to enable these logs despite the fact that these servers frequently hosted files in Excel, Word, or Microsoft Access, each with significant amounts of sensitive, protected data—including PII and CUI. Indeed, ADM uses Excel in particular pervasively for daily operations and reporting as a core operational tool—particularly Microsoft Excel.

82. This lack of auditability extended throughout the ADM system. ADM failed to keep inventory of many of its external data transmissions, both within ADM and to external systems. While ADM's job scheduling software likely kept track of some internal and external transfers, as much as 50% of all FTP transfers occurred outside the scheduling software and no records exist about such transfers. Also, many other SFTP and FTPS transfer protocols were utilized outside the job scheduler environment and thus the job scheduling software also failed to capture many SFTP or FTPS transfers. Additionally, ODBC/JDBC transfers, bulk SQL database imports or exports, and BOTS transfers (automated scripts or robotic process automation that moves data between systems) were either never or almost never recorded. Transfers via file transfer services and e-mail were also not tracked.

83. For example, teams routinely generated SQL extracts from production systems and implemented API integrations and automatic file transfers without registering, logging, or cataloging these data flows in any enterprise inventory or governance process.

84. In combination, ADM both could not tell when data was accessed and, in many instances, when it was transferred. These two glaring failures mean that ADM could not independently discover if a breach transmitting sensitive data from these different resources to an external system had occurred or who was responsible.

*Climate Smart Commodities: How ADM's Cybersecurity Fails NIST 800-171 Standards: External Communications*

85. NIST 800-171 requires entities to "monitor, control, and protect organizational communications . . . at the external boundaries and key internal boundaries of the system," and to "prevent unauthorized and unintended information transfer via shared system resources." 3.13.1 and 3.13.4, NIST 800-171, rev1.

86. Even for the transmissions that are tracked, ADM fails to monitor what country the transmission came from and to what country it terminates. In other words, ADM has no way of knowing whether CUI has been transmitted abroad, including to sanctioned countries like Iran or North Korea.

87. Another symptom of ADM's deficient controls is that data sharing arrangements with external systems were also frequently not disabled when the need for sharing the information expired. Instead, ADM would often continue to share information with companies for months or sometimes years before ADM would turn off the transfer. This failure is a direct result of ADM's failure to adequately monitor or track its data-sharing arrangements throughout its fragmented system.

*Climate Smart Commodities: How ADM's Cybersecurity Fails NIST 800-171 Standards: Encryption*

88. NIST 800-171 requires entities to "protect the confidentiality of CUI at rest." 3.13.16, NIST 800-171 rev1. It also requires entities to "implement cryptographic mechanisms to prevent unauthorized disclosure of CUI during transmission unless otherwise that a compliant system "store[s] and transmit[s] only encrypted representation of passwords." 3.5.10, NIST 800-171.

89. ADM's use of encryption for sensitive information sent between internal and external systems is also deficient. As discussed above, shared servers and the data lake also have no data-level encryption and thus anyone with access to those servers or the data lake can view and use sensitive information displayed in plain text.

90. While ADM sometimes sends information through encrypted channels through encrypted transfer protocols, ADM has inadequate central control over the use of encryption in

transfers. As such, sensitive information is frequently sent in plain text both internally and externally, posing significant risks.

91. For example, ADM heavily relies on SQL extracts for transferring unencrypted data from applications to various servers. ADM also frequently uses unencrypted staging directories or landing zones when transmitting data from one area to another internally.

92. As to external transfers, Relator is aware of the significant use of email, DropBox, and WeTransfer to transmit sensitive data without encryption. ADM employees would transmit sensitive information, including PII, in excel spreadsheets before sharing both internally and with third-parties.

93. ADM's physical safeguards do not protect against interception of transmission from an individual inside ADM's private network.

94. Nor do the physical safeguards protect against interception of transmission when an ADM individual transmits unencrypted information to an external source, as frequently occurs.

95. The shared servers, discussed above, also included unencrypted authentication and password information.

*Climate Smart Commodities: How ADM's Cybersecurity Fails NIST 800-171 Standards: Inadequate Third-Party Vetting and Inadequate Remediation*

96. NIST 800-53 requires a system compliant with that standard to require external information system services to comply with organizational system requirements and to monitor security control compliance by external providers on an ongoing basis. SA-9, NIST 800-53, rev4. This requirement has existed in NIST standards since the initial versions of NIST 800-171. NIST 800-171 does not include expressly include this control, but its omission is not because the requirement is not important or expected. Instead, NIST 800-171 indicates that this control is so basic that NIST believed that non-federal entities were expected to comply with this requirement

without the inclusion of any specific provision in the technical standard. *See* NIST 800-171 at Page 52 (defining tailoring acronym NFO as "expected to be routinely satisfied by nonfederal organizations without specification"); *id.* at 67 (listing SA-9, External System Services control as omitted because of "NFO"). ADM's actions with respect to Inadequate Vetting of Third-Parties violate this standard.

97. NIST 800-171 requires entities to "identify, report, and correct information and system flaws in a timely manner." NIST 800-171. NIST 800-171 also demands a variety of other monitoring and remediations, including periodically assessing security controls and implementing plans to correct deficiencies as well as monitoring those controls. *See generally* 3.12, NIST 800-171, rev1.

98. ADM's global system interacts with potentially 10,000 third-parties with varying levels of access to its IT system. Yet despite interacting with some 10,000 third-parties, ADM performs cursory monitoring on only 75 or so annually, none of which is done on-site. It does no routine monitoring on a routine or scheduled basis and therefore does not know about any third-party's access controls, their encryption, or their own cybersecurity breaches. It only required SOC 2 reports from approximately 300 of the 10,000 parties with whom ADM interacts and shares data.[4] The remaining thousands are entirely unvetted.

99. Some of these third-parties have deeply intimate access. For example, since 2018, Tata Consultancy Services ("TCS") has been paid to run all of ADM's back-end IT services, including database management and help desk support, and it had full access to all ADM systems and data. Indeed, TCS was embedded in managing information security functions, managing data

[4] A SOC 2 Report is generally done by an independent auditor in comparison to a compliance framework developed by the American Institute of Certified Public Accountants.

lake access, managing servers and access, and troubleshooting access and passwords via the help desk. In other words, TCS was largely in charge of policing access to ADM's data, including the government data it stored.

100. Yet despite TCS's universal access to ADM information, ADM's risk monitoring included only reviewing TCS's annual report called a SOC 2 Report. ADM relied on only this report and did not perform other ongoing monitoring or evaluation of TCS.

101. As described in more detail related to ADM's knowledge of the falsity of its statements to the government, ADM has known for years about the many flaws in its system, yet it has done little to nothing to remediate those flaws

***Climate-Smart Commodities: ADM's False Representations***

108. In a March 11, 2022 Notice of Funding Opportunity ("NOFO"), USDA announced the availability of $1 billion in grants funds for the Partnerships for Climate-Smart Commodities grant.

109. The NOFO indicated that "an applicant ***must*** meet the following standard ***to be considered for award***: . . . compliance with the standards outlined in 2 C.F.R. Part 200 Subpart D for procurement, property, and records management." The NOFO then indicates that "submission of an application ***constitutes a certification that an applicant meets these standards.***"

110. Even at the time of applying for the grant, ADM's Chief Privacy Officer, Chief Compliance Officer, and Chief Information Security Officer had already been aware of the Data Lake issue. ADM was also aware of the prior audit.

111. ADM nevertheless submitted an application, certifying it met these requirements. According to the NOFO, the deadline to apply for a grant of ADM's size was May 6, 2022. ADM's authorized representation submitted an application on or around that date. That application was a "certification" that ADM met 2 C.F.R. Part 200 Subpart D. As detailed above,

that certification in submitting that application was false. This application came after ADM had already been made aware of pervasive security issues in the data lake and the other issues identified, as detailed *infra* at ¶¶ 188–203 below.

112. The application, including an SF-424 form, would have contained a signature that "I certify (1) to the statement contained in the list of certifications**." As SF-424, the "list of certifications and assurances . . . is contained in the announcement or agency specific instructions." Because the NOFO indicated that submission of an application was compliance with 2 C.F.R. Part 200 Subpart D, the application contains a certification of assurance with that specific sub-part. As detailed above, that certification, which was submitted on or around May 6, 2022, was false.

113. ADM's prepared a project narrative, and it ultimately accepted a grant.

114. Specifically, on June 8, 2023, Greg Morris, a Senior Vice President at ADM, signed a grant on behalf ADM, identifying number NR233A750004G053, for the claim-smart commodities program. ADM was awarded $90 million in federal funds.

115. The signed grant indicates a "Recipient Responsibilit[y]" to "[c]omply with the applicable version of the General Terms and Conditions." At the time of signature, those were the November 2022 General Terms and Conditions, including the obligations to protect Protected Information by, among other things, disclosing that information only to individuals internally with a demonstrated need to know, as detailed above. Signing this grant was a false promise as ADM knew it was not compliant and had no plans to become compliant with those terms. Before accepting the award, the signatory of the grant had already received a formal audit detailing the deficiencies related to protection of this information.

116. Those General Terms and Conditions included provisions expressly reiterating that the award is subject to 2 C.F.R. Part 200, which includes 2 C.F.R. § 200.303. Specifically, the

Terms and Conditions require that "***as a condition of this award***, the recipient ***assures and certifies*** that it has and/or will comply . . . with the requirements contained in . . . . 2 C.F.R. Part 200." The Terms and Conditions also indicated that 2 C.F.R. Part 200 is "hereby incorporated by reference."

117. Attached to the signed grant were "Additional Specific Terms and Conditions." Those also included a statement that "[t]he award recipient must abide by all terms of this grant, including, but not limited to, the General Terms and Conditions, the terms in the Funding Opportunity . . . and this addendum." Signing a grant with these terms was false because ADM did not comply with the provisions of 2 C.F.R. Part 200 or the provisions regarding Protected Information it had no intent to do so.

118. After receiving the grant, ADM also then engaged in activities under the award. For example, public sources indicated after receiving the grant, ADM planned to offer incentive payments to producers and produce climate-smart products with partners including Costco and Keurig-Dr. Pepper. ADM's website currently still promotes farmer incentive payments under the program, now rebranded as Advancing Markets for Producers grant. Public information also indicates that ADM has drawn down approximately $40 million from the grant as of most recent public reporting.

119. Under the applicable Terms and Conditions, ADM was required to fill out a "properly completed and executed SF-270" to seek reimbursement for grant activities. In seeking reimbursement under that form, ADM was required to represent each time that it sought reimbursement under the grant that "I certify that to the best of my knowledge and belief . . . that all outlays were made in accordance with the grant conditions . . . ."

120. Public records indicate that USDA's outlays under the grant occurred after October 1, 2024, in which 2 C.F.R. Part 200 was modified to expressly require "[t]ake reasonable cybersecurity and other measures to safeguard information including protected personally identifiable information (PII) and other types of information," including information the recipient itself or its subrecipients considers to be sensitive. 2 C.F.R. § 200.303(e).

121. ADM's express representations in requesting reimbursement under that grant—its representations that it complied with grant conditions, including the modified 2 C.F.R. § 200.303(e), was also false. The deficiencies remained at the time ADM sought reimbursement both because ADM failed to meet its contractual promise and it failed to meet 2 C.F.R. Part 200.

122. Both the false promises and these SF-270 certifications are also false under an implied certification theory. To the extent these representations were in any sense literally true, they were misleading half-truths as it relates to NIST 800-171 and compliance with CUI regulations.

123. The contractual promises and certifications of compliance with grant terms are representations about the cybersecurity services provided as a condition of the grant. It is actionably misleading to certify compliance with a grant in which ADM promised to employ the principle of least privilege (e.g., disclosing protect information "with a demonstrated need to know"), promised that it was in compliance with regulations requiring effective internal controls related to information security and reasonable steps to safeguard PII, while withholding that ADM at the time knew it was significantly out of compliance with the operative NIST 800-171 standards (including the NIST 800-171 standards related to those promises).

***Climate Smart Commodities: How ADM's Falsehoods Were Material to Payment Under the Grant***

124. Under the False Claims Act, material means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

*Climate-Smart Commodities: Why the Nature of the Information Stored Is Sensitive and Important*

125. The material ADM generated and stored in connection with the Climate-Smart Commodities grant—producer PII and agriculture information—is both sensitive and important.

126. As recognized in OMB Memoranda M-17-12, *Preparing for and Responding to a Breach of Personally Identifiable Information*, identity theft is a significant problem that "can result in embarrassment, inconvenience, reputational harm, emotional harm, financial loss, unfairness, and, in rare cases, risk to personal safety." *Id.* at 6–7.

127. As to agricultural data specifically, breaches can impact a farm competitively. Disclosure of farm data can also lead to unwanted contact and even harassment. *Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*, 836 F.3d 963, 971 (8th Cir. 2016) (describing potential harms from EPA's unlawful disclosure of farmer PII and concluding that EPA abused its discretion in concluding that compilation of PII did not implicate substantial privacy interest).

128. Food and agriculture has also been designated part of the nation's critical infrastructure sector. This means that foods and agriculture is an industry "whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or destruction would have a debilitating effect on security, national economic security, national public health or safety, or any combination thereof.

129. The text of NIST 800-171 itself indicates that CUI in such sectors is particularly important. In generally, "protect[ing] . . . CUI resident in nonfederal systems and organizations if of ***paramount importance to federal agencies*** and can directly impact the ability of the federal

government to successfully conduct its assigned missions and business operations." Protecting this information is even more important when related to "***those missions and functions related to the critical infrastructure***," of which food and agriculture is a part.

130. The Government, including USDA, also recognize that its non-federal CUI holders will employ the same baseline security that the government itself would use, as the government is duty-bound to ensure that this information remains protected on systems outside of the Government's control. *See Controlled Unclassified Information,* 81 Fed. Reg. 63,324-01, 63,325 (September 16, 2026) ("It would be nonsensical to require the Government to protect and control information but to simultaneously allow others to leave the same information unprotected. The dispositive issues are not who protects the information, whether it is difficult or costly to protect it, or even how one goes about protecting it. . . .").

131. The unique sensitivity of this information also led to a specific legislative enactment requiring specific protections for this category of data. 7 U.S.C. § 8791(b) prohibits "any officer or employee of the Department of Agriculture, *or any contractor or cooperator of the Department*" from disclosing "(A) information provided by an agricultural producer or owner of agricultural land concerning the agricultural operation, farming or conservation practices, or the land itself, in order to participate in programs of the Department." USDA has interpreted this provision to reach the exact type of information ADM is generating and storing in connection with the Climate-Smart Commodities Grant.

*Climate-Smart Commodities: How the Grant Application, the Grant Itself, and Related Regulations Reflect the Capability of the Representations to Influence Payment*

132. The nature of the Climate-Smart Commodities Grant requires that producers provide sensitive information under the grant. Without such information sharing, the USDA cannot further the policies of the grant while also maintaining effective oversight of that grant.

Nor can USDA meaningfully evaluate whether the policy goals of the grant have been achieved without knowing significant information about producers and their farms.

133. Meanwhile, producers are often reluctant to share such information as it is both competitively sensitive and privately sensitive for the reasons just detailed.

134. Both ADM and the USDA recognized the unique importance and sensitivity of this category of information in connection with this grant.

135. For example, ADM's project narrative recognize itself recognized that this data is sensitive. ADM wrote that "data collection will be as streamlined as possible ***since sharing data can be sensitive and onerous proposition for producers***." A grant applicant would not make representations about sensitive data and its intentions to promise how producer data would be protected if the applicant did not believe that entity awarded the grant might consider that information is awarding the grant or reimbursing under the grant.

136. USDA also indicated the importance of data protection to this specific grant in its grant-specific Terms and Conditions. USDA required a grant-specific promise that ADM would "provide each producer . . . a description . . . of how their . . . data about their farm and commodities, will be utilized []and, protected. . . . ." This reflects USDA's own recognition that it needed producer cooperation in sharing data but that producers were often reluctant to share this data. USDA would not require ADM to describe to producers ADM's data protection efforts if ADM's data protection was incapable of influencing USDA's payment actions.

137. The other circumstances of the grant also reflect the capability of this information to affect USDA's payment decisions

138. The NOFO in the Climate-Smart Commodities Grant designated compliance with 2 C.F.R. Part 200 as a standard "applicant ***must*** meet . . . to be ***considered*** for award." (emphasis

added). The application alone constituted a certification that ADM had met these standards, which were necessary to even be considered.

139. In signing the grant and agreeing to the General Terms and Conditions, ADM also "assured and certifie[d]" that ADM complied with these same provisions "as a condition of this award."

140. The Terms and Conditions also indicates that ADM "***will*** be held responsible for violations" of the specific provisions concerning Protected Information, including that ADM must "internally restrict access to the protected information to only those individuals who have a demonstrated need to know." November 2022 Terms and Conditions, Section XIX, Acknowledgment of Section 1619 Compliance (emphasis added).

141. The General Terms and Conditions applicable to the Climate-Smart Commodities Grant otherwise indicate that failure to comply with those conditions "may result in action by FPAC [USDA's Farm Production and Conservation Mission Area], including termination of the underlying Federal Award."

142. Similarly, 2 C.F.R. §§ 200.339 and 200.340 provide that an agency may terminate an award for failure to comply with its terms and conditions. 2 C.F.R. § 200.339(a) also permits an agency to withhold payments until the grant recipient takes corrective action. Indeed, all regulatory remedies for failure to comply with grant terms or conditions are related to delaying payment until compliance, terminating the award, or paying less under the grant. 2 C.F.R. § 200.339.

143. The statutory, regulatory, and policy framework also requires the contracting officer to require the misrepresentations at issue here to be capable of influencing payment. 7

U.S.C. § 8791(b) is a mandatory statutory protection, and an agency has no discretion to excuse compliance with it.

144. Additionally, since September 13, 2021, USDA adopted a formalized CUI policy in which it reiterated that USDA, and in particular its Chief Information Officer, was required to ensure that USDA applied at least NIST-171 Revision 2 when establishing security requirements. This was implemented prior to the Climate-Smart Commodities Grant, and a contracting officer has no authority to violate it or to allow it to be violated.

*Climate-Smart Commodities: Other Facts Related to Capability to Affect Payment*

145. ADM's other actions also establish that these representations were capable of influencing payment decision-making. As described below, ADM has been monitoring its compliance or non-compliance with NIST standards since 2019. If ADM did not believe that Government viewed these requirements as material to its contracts or grants, ADM would have no reason to compare its compliance with those specific government-related standards.

146. The size and scope of the deficiencies also supports how the representations were capable of influencing decision-making. As detailed above, these violations were not mere technicalities or sporadic. Rather, the failures were systemic, pervasive, and longstanding.

147. Relator is not aware of any instance in which the Government has paid out funds on a grant similar to this one, despite knowing of violations in cybersecurity standards related to information that a grant recipient promised to protect in the express terms of the grant.

*Climate-Smart Commodities: Prior Enforcement Activity*

148. ADM's representations through its promises made in applying for the grant and in certifying that it was contending to comply with the grant in requesting reimbursement are also similar to those that the Government has previously indicated were material to payment on a claim.

149. For example, DOJ alleged false claims in connection with contract between the Pennsylvania Department of Health and a staffing and services company, Insight Global. In the contract, Insight Global recognized that its work face "will have access to personal health information of contract tracing subjects and must ensure that and all other such information related to the services being provided must be kept confidential and secure." Insight Global, however, transmitted personal health information and PII through unencrypted emails, shared passwords, and transmitted information through Google files that were not password protected. It then failed to promptly remediate the issue. Through this enforcement activity, DOJ reflected a government position that within this context, a promise to keep information "confidential and secure" was material to the Government's payment decision on the contact-tracing contract.

150. As another example, the DOJ alleged false claims involving cybersecurity flaws related to an Emergency Rental Assistance Program ("ERAP"). The ERAP Prime Contractor had contractual requirements for the standards of technology it would use. The contractor instead used third-party software without approval to store PII. The third-party software allowed a security breach, although there was no evidence the stored PII was viewed or used by unauthorized parties. DOJ alleged that it had civil claims against the contractor "for knowing use of Unauthorized software . . . in violation of the cybersecurity requirements." Again, this is a reflection that contractual promises related to cybersecurity, like those promises detailed here, are material to the Government's decision to pay the claim.

151. As another example, the DOJ settled a case against Comprehensive Health Services. According to public records, "the United States alleged that, between 2012 and 2019, CHS failed to disclose to the State Department that it had not consistently stored patients' medical records on a secure EMR" because "CHS staff saved and left scanned copies of some records on

an internal network drive, which was accessible to non-clinical staff" and then failed to "take adequate steps to store the information exclusively" on the secure system. Much like the data lake and shared servers here, CHS stored sensitive information where it could be accessed by internal personnel that nevertheless should not have had access, and the DOJ alleged this was material to "contract requirements relating to the provision of medical services."

152. This enforcement activity generally supports materiality where an entity makes express promises to keep information secure and fails to comply with that promise by providing sub-standard cybersecurity. ADM made such promises here.

153. Since 2021, the Department of Justice has otherwise launched the Cyber-Fraud Initiative. DOJ has entered into several False Claims Act settlements based on the initiative related to various cybersecurity failures. These include *United States ex rel. Elevation 33, LLC v. Guidehouse Inc., et al.*, 1:22-cv-206 (N.D.N.Y.); *United States ex rel. Brian Markus v. Aerojet Rocketdyne Holdings, Inc., et al*., Case No. 2:15-cv-02245, Dkt. 135, p. 2 (E.D. Ca. Oct. 20, 2021); *United States ex rel. Lawler v. Comprehensive Health Servs., Inc. et al.,* Case No. 20-cv-698 (E.D.N.Y.); *United States ex rel. Doe v. Raytheon Co.*, 21-cv-2343 (D.D.C.); *United states ex rel. Lenore v. Illumina Inc.*, No. 23:cv-00372 (D.R.I); *United Sate ex rel. Seilkop v. Insight Global LLC*, 21-cv-1335 (M.D. Pa.). DOJ also entered into a pre-complaint settlement with Health Net Federal Services, LLC and Centene Corporation related to cybersecurity deficiencies. *See https://www.justice.gov/opa/pr/health-net-federal-services-llc-and-centene-corporation-agree-pay-over-11-million-resolve.*

154. As recent statement from the U.S. Attorney for the Western District of North Carolina provides further support for materiality. In connection with a DOJ settlement in *United States ex rel. Tenney v. Honeywell Int'l Inc.*, Mr. Russ Ferguson indicated generally that

"Companies that seek and profit off of government contracts have an obligation to ensure sensitive data is protected."

## ADM'S FALSE CLAIMS REGARDING COMMMODITIES CONTRACTS

155. ADM and its subsidiaries (ADM Rice Inc. and Golden Peanut, LLC) also entered into approximately 90 relevant commodity purchases. A list of these contracts, including award IDs, titles, and period of performance is attached as Exhibit A. ADM's authorized representative for each of these contracts made representations on behalf of ADM or on behalf of the contracting ADM subsidiary.

156. These commodities contracts are governed by two different types of contracts. For commodities contracts to be sold domestically, ADM agrees to the Master Solicitation for Commodities Procurements – Domestic (MSCP-D). For commodities contracts to be sold internationally, ADM agrees to the Master Solicitation for Commodities Procurements – International (MSCP-I).

### *Commodities Contracts: What Duties Are in the Contractual Terms*

157. These commodities contracts are governed by two different types of contracts. For commodities contracts to be sold domestically, ADM agrees to the Master Solicitation for Commodities Procurements – Domestic (MSCP-D). For commodities contracts to be sold internationally, ADM agrees to the Master Solicitation for Commodities Procurements – International (MSCP-I).

158. At a certain date for each category of contract USDA expressly incorporated a provision of the Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 52.204-21, into the MSCP-D and MSCP-I contracts. MSCP-D incorporated § 52.204-21 on or after February 13, 2025.

MSCP-I incorporated § 52.204-21 on May 7, 2025. Relator will refer to these groups of contracts collectively as the "Express Incorporation Contracts."[5]

159. For all identified MSCP-D contracts entered into before February 13, 2025, ADM's authorized representative agreed to provisions promising to flow down 48 C.F.R. § 502.204-21 to subcontractors. Specifically, ADM promised to "insert [48 C.F.R. § 52.204-21] clauses in subcontracts for commercial items." When ADM is required 48 C.F.R. § 52.204-21—and where this provision of FAR is otherwise a mandatory contractual requirement—ADM also contractually promised to comply with 48 C.F.R. § 52.204-21. Relator will refer to these groups of contracts collectively as the "Flow-Down Contracts."

***Commodities Contracts: What Sensitive Data Does ADM Generate and Store?***

160. ADM does not own farms. To supply the goods in a commodities contract with the Government, ADM must acquire those commodities from individual producers.

161. ADM has significant records generation and storage requirements in connection with these contracts. For example, both the Express Incorporation and Flow-Down Contract groups incorporate FAR 4.7 governing "Contract Records Retention." This requires retention of to "satisfy negotiation, administration, and audit requirements." This would include records related to the farms from which the commodities sold under these contracts came.

162. As discussed, the MSCP-D contracts include requirements to maintain information that "confirms 100% domestic origin traceback from the destination to the origin orchard/field/vineyard/farm/etc., including all steps in the process."

---

[5] Discovery may reveal that similar contract language related to 48 C.F.R. § 52.204-21 was expressly incorporated into commodities contracts prior to the dates they were included in the master solicitation agreements. Those contracts would give rise to liability for the same reasons.

163. Based on FDA requirements, ADM, as both a commodities purchaser and transporter, ADM must store detailed information about the sources of foods ADM acquires, stores, and transports—including names, addresses, telephone numbers, and lot numbers from the originators of the commodities. 21 C.F.R. §§ 1.337, 1.345, and 1.352.

164. All of this information constitutes AG information within the definition of CUI and falling with USDA's interpretation of information barred from disclosure under 7 U.S.C. § 8791(b).

165. Relator has also personally observed this information in the data lake and shared servers. Based on the end-to-end nature of ADM's system, Relator understands that the information related to this government commodities contracts is not treated differently within ADM than ADM's other information.

***Commodities Contracts: How ADM Failed to Comply***

166. ADM has failed to comply with its regulatory duties to protect CUI for the same reasons as Relator described in the Climate-Smart Commodities Grant. Given the nature of ADM's system, all of those identified issues would apply equally to the CUI ADM possesses on behalf of the Government in connection with these commodities contracts.

167. The applicability of CUI regulations is confirmed by the enacting commentary related to 48 C.F.R. § 502.204-2, which ADM agreed to in these contracts. The Government there described that "when contractors will be processing CUI or higher-level sensitive information, additional safeguarding standards . . . will apply." Federal Acquisition Regulation; Basic Safeguarding of Contractor Information Systems, 81 Fed. Reg. 30439, 30442 (May 16, 2026).

***Commodities Contracts: ADM's Commodities-Contract Misrepresentations***

168. Each of these contracts—the Express Incorporation and the Flow-Down Contracts—contain promises related to cybersecurity of a certain standard.

169. Each of these contracts includes a provision incorporating FAR 52.246-15, governing a Certificate of Conformance. That provision provides that products shipped under these contracts are accompanied by an express certification that the contractor "furnished the supplies or services called for . . . in accordance with all applicable requirements," and that "the supplier or services are of the quality specified in all respects with the contract requirements." Such certificates are submitted with ADM's invoices, which are submitted to the Government to receive payment under the contract.

170. Because ADM stored CUI in connection with these contracts, the regulations governing CUI are an applicable requirement. When ADM delivered under these contracts and prepared a Certificate of Conformance certifying that the "suppliers or services called for" were "in accordance with all applicable requirements," that statement was false. The commodities contracts called for a certain level of cybersecurity services through the incorporation of 48 C.F.R. § 52.204-21. Because those services also involve treatment of CUI, the CUI regulations were applicable requirements. Because ADM failed to comply with those regulations, its statement that its services were rendered "in accordance with all applicable requirements" was false.

171. Additionally or alternatively, these certificates are false under an implied certification theory.

172. When ADM represented that its products and services under the contract were in conformance with all "applicable requirements" and that it provided "services of the quality specified in all respects with the contract requirements," that certificate is a reiteration that ADM, during the course of performance, at least complied with the contractual requirements regarding cybersecurity 48 C.F.R. § 52.204-21. These certifications are statements about the cybersecurity services ADM provided in connection with delivering on its commodities contract.

173. When ADM represented its compliance with § 502.204-21, it represented that it was in compliance with the clause that requiring ADM to "limit information access to authorized users" and "limit information system access to the types of transactions and functions that authorized users are permitted to execute." If this statement is literally true, it is a misleading half-truth because at the time ADM knew that ADM was violating the related baseline NIST 800-171 requirements, despite storing CUI, as described above. ADM users were routinely authorized with excessive privileges in violation of the principle of least privilege, and that excessive privilege led them to have the ability to access many transactions and functions for which they had no legitimate justification (*i.e.*, accessing sensitive PII or other farm data).

174. Similarly, when ADM represented compliance with § 502.204-21, it represented compliance with the clause that requires ADM to "verify and control/limit connections to and use of external information systems" and that it "monitor[s], control[s], and protect[s] organizational communications (*i.e.*, information transmitted or received by organizational informational systems) at the external boundaries and key internal boundaries of the information systems." To the extent this statement of compliance is literally true at some level, it is a misleading half-truth because ADM knew it violated the baseline NIST 800-171 requirements, despite storing CUI, because at the time it had no information on a vast array of its data transmissions, including external transmission and the transmission of unencrypted information to third-parties.

175. When ADM represented compliance § 502.204-21, it represented that it "identif[ies], report[s], and correct[s] information and information system flaws in a timely manner." Even if this statement of compliance with this provision is in some sense literally true, it is a misleading half-truth when ADM knew it had failed to remedy failures to comply with the baseline NIST 800-171 requirements, despite storing CUI.

***Commodities Contracts: How These Representations Are Capable of Influencing Payment***

176. ADM creates or possesses CUI in connection with these commodities contracts. That information is sensitive and important, and the USDA is required by statute to protect it. For the reasons explain in more detail *supra* at ¶¶ 125–131; 143–144; 145–147; 148–154, protecting that information is capable of influencing USDA's payment decisions on the commodities contracts.

177. The contracts expressly indicate that the Government is entitled to terminate the contract for cause if the contractor "fails to comply with any contract terms or conditions." In this situation, USDA "shall not be liable to the Contractor for any amount for supplies or services not accepted."

178. FAR provisions applicable to both MSCP-D and MSCP-I contracts indicate that the Government has a right to terminate contracts for failure to comply with the terms and conditions. 48 C.F.R. § 52.249-8.

179. ADM and USDA's actions with respect to the Climate-Smart Commodities grant, and the specific terms related to that grant, also support the capability of ADM's representations as to these contracts to be capable of affecting payment decisions. Those actions and those specific terms reflect that USDA cares about the category of information reflected in those terms and representations. There is no reason to believe that USDA would attach payment consideration to the same information in one circumstances (a grant) and not the other (a commodities contract).

180. Particularly given that USDA cares about protecting this specific category of data, the representations are capable of influencing payment decisions because cybersecurity services of differing standards have differing economic value. Poor services have a lesser economic value than better services, including ones that meet at least an agreed-upon or applicable standard. A

reasonable person contracting for a certain standard of cybersecurity service will not pay the full contract price if the service it received did not meet that standard.

181. The Cybersecurity requirements in the commodities contracts reflect that the Government contracted for a bundled product and service. The product is the commodity itself, but the service is the protection of the electronic information related to the contract on the terms promised and certified. As with any contract, the price invoiced, and the payment made under the invoice, reflects performance of the entire bundled product/service package.

182. The negotiation also occurred against the backdrop of ADM's regulatory requirement to protect CUI consistent with the NIST 800-171 standards, as ADM would be generating and storing CUI in connection with the contracts, as detailed above.

183. As an economic reality, a reasonable person would pay less if the person discovered that the bundled product/service package did not match the contractual or regulatory bargain struck. At a minimum, representations about whether the cybersecurity services in a bundled agreement meet the required standard are *capable* of influencing whether the agency or contracting officer pays full price under the contract.

184. Because the services part of the package—here, the promised cybersecurity services of a certain standard—did not match the standard, a reasonable person would attach some importance to statement that those services were of the bargained-for standard because that person is not receiving what it paid for when it bargained for those services at that standard.

185. This is particularly true when the degree to which the standards failed to live up to standards was pervasive and systemic, as is the case here.

186. The nature of cybersecurity and electronic information gathering is such that a government agency including data-security requirements must at least be capable of attaching

some payment importance to promises about those efforts and representations of compliance with those efforts.

187. Were such promises and certifications of compliance with them incapable of influencing payment, the inclusion of such terms related to cybersecurity in these contracts and the existence of the regulatory requirements would be largely illusory; the only meaningful enforcement for sub-standard cybersecurity services is a payment-related one. Requiring such efforts, which are not onerous, is thus foundational to the purpose of the Government-wide effort to protect this category of data and it is foundational to USDA's efforts to implement this effort in administering its contracts.

## ADM ACTED KNOWINGINGLY IN MISREPRESENTING FACTS TO THE GOVERNMENT

188. ADM made its false representations knowingly.

189. Under the False Claims Act, a statement is made, used, or caused to be made or used "knowingly" when it is done with "actual knowledge of the information," in "deliberate ignorance of the truth or falsity or the information," or "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729 (b)(1)(A).

190. ADM has engaged in formal audits that have revealed its cybersecurity deficiencies. For example, in early April 2019, Mr. Pannek formally identified the risks posed from failing to adequately track internal and external data transfers. IT leadership was informed at or around the same time, including ADM's Chief Information Security Officer, Chief Information Officer, and Vice President of Infrastructure.

191. Mr. Pannek was also involved in a formal audit of four randomly identified SOX-related shared servers in October 2019. In the audit, ADM found that there were excessive individuals with highly privileged access to these servers, and these servers contained sensitive

information (including PII in voluminous amounts) unencrypted for anyone with access. This audit was formally distributed to both the Chief Information Officer and the Chief Information Security Officer. Throughout Mr. Pannek's time, other instances of easily obtainable, plaintext PII were shared with the CIO and CISO as well as with the Chief Compliance Officer, Chief Privacy Officer, and others.

192. As discussed above, October 2019 was not the first time ADM had heard of sensitive PII being contained on various shared services with excessive access privileges. When the GICS Senior Director, Risk Assurance (and previous Director, IT Audit) heard about the results of the October 2019 server audit, he acknowledged that this was a longstanding problem that was not at all surprising. This reaction to the October 2019 Audit reflects that, while the October 2019 Audit formalized identification of the deficiencies, ADM knew before the October 2019 about those deficiencies, at least as to those related to excessive access privileges for sensitive information like PII.

193. Additionally, ADM knowingly chose to implement its IT General Controls on only a subset of servers that contained sensitive information. The Sarbanes-Oxley Act ("SOX") contains its own cybersecurity requirements related to financial data and financial reporting. It implemented these IT General Controls on only SOX-relevant servers and applications prior to this time, and it selected to audit these servers only because they were SOX-relevant. ADM knew shared servers had sensitive information other than servers identified as SOX-relevant. Yet it implemented IT General Controls on only the SOX-relevant servers. Through this conduct, ADM knew that these controls were not implemented for the other servers.

194. In 2021, ADM's DGO began a formal investigation into data contained within the data lake detailed above, as well as the controls implemented on access, use, and transfer. DGO

discovered the ingestion of hundreds of millions of sensitive records, including PII into the lake via the use of automatic data ingestion from hundreds of applications, despite hundreds of users having access to the lake with no legitimate justification to have access to this vast volume of sensitive material. During the scope of this DGO analysis, DGO individuals raised the size and scale of the issue with the Chief Privacy Officer, Chief Compliance Officer, and Chief Information Security Officer. The issue was formally documented in January 2022.

195. The Chief Privacy Officer acknowledged the risk from the lake. She recommended all PII be removed from the data lake and for ADM to develop policies and prevent the reingestion of this information into the lake. She also commissioned a different team, Internal Audit, to review the finding of the Data Governance Office.

196. After two months of investigation, Internal Audit confirmed DGO's findings and issued a report to all executive management on July 12, 2022, concluding (among other things) that the PII stored in the Data Lake should be removed, obfuscated, or additionally secured.

197. Greg Morris, a Senior Vice President at ADM, was included on the distribution list for this audit. He received this audit prior to signing the Climate-Smart Commodities grant, identified above.

198. Rather than ameliorate the situation, however, ADM chose a different tactic: within a month of Internal Audit reporting to management, ADM's CIO elected to disband the Data Governance Office entirely.

199. Throughout this time, ADM was aware of NIST standards. For example, when Mr. Pannek began at ADM in 2018, the Director of Global Information, Cyber Security worked to evaluate and map the ADM IT General Controls that it had developed to NIST 800-53. To the extent ADM will claim that NIST 800-53 applies to only federal information systems, NIST 800-

53 itself references NIST 800-171—a publication which is descriptively titled "Protecting Controlled Unclassified Information in Nonfederal Systems and Organizations." And comparison to the NIST 800-53 standard will necessarily reveal issues related to NIST 800-171 as well.

200. At least since the September 2020 rev5 version, NIST 800-53 also references and incorporates the regulatory requirements governing Controlled Unclassified Information in 32 C.F.R. § 2002, which in turn requires compliance with NIST 800-171 for non-federal systems. Prior versions of NIST 800-53 discussed and incorporated Executive Order 13556 and extensively discussed the methods necessary to adequately protect that CUI.

201. Moreover, in quarterly Enterprise Risk Management Reports, aspects of NIST are metrics contained within an excel table of metrics to track on a quarterly basis. This further reflects ADM's awareness of NIST standards. In combination with ADM's knowledge of various deficiencies, this reflects ADM's knowledge that it failed to meet those standards as well as that meeting those standards was a regulatory requirement.

202. In an October 2022 "Suppliers Expectations" document, ADM also listed as an expectation of its suppliers to "safeguard ADM's confidential information, including personal and proprietary data, in order to remain a trusted partner," including a stated expectation that its suppliers will "comply with all applicable data protection laws, including . . . appropriate technical and organizational measures preventing improper access." Yet at the same time, ADM was failing to do those same things for the government data it stored—while representing the opposite to the Government in order to receive contracts and grants.

203. ADM is also a large company with multiple C-suite executives in charge of compliance, information governance, and information security. Given its large compliance apparatus, individuals with authority clearly know about the NIST standards, ADM's storage of

CUI, ADM's storage of other sensitive information. To the extent the individual making any specific representation did not have actual knowledge that its representations were false or misleading half-truths, it was because that individual or group of individuals deliberately determined not to know whether its assertions were true or false or the individual or group of individuals made the assertions reckless to whether they were true or false.

## COUNT 1: VIOLATION OF THE FALSE CLAIMS ACT

204. Relator incorporates the allegations in the preceding paragraphs as if fully incorporated herein.

205. Through the actions described above, ADM repeatedly violated the False Claims Act.

206. As discussed above, ADM made a series of false statements concerning its cybersecurity, including entering into contracts and grants with Terms and Conditions related to cybersecurity. ADM then affirmed compliance with those terms and conditions in seeking payment or reimbursement.

207. The Certificate of Conformance and Form SF-270s are false or fraudulent claims for payment or approval under 31 U.S.C. § 3729(a). They also include false statements material to a false or fraudulent claim under 31 U.S.C. § 3729(b).

208. The agreements to the grants on the Terms and Conditions identified are false statements material to a false or fraudulent claim under 31 U.S.C. § 3729(b).

209. As discussed above, ADM made these representations "knowingly" as that term is defined in the False Claims Act. At the time ADM made these representations, it knew of the cybersecurity failures identified above. To the extent it did not specifically know any specific representation was false, it was because ADM deliberately determined not to know whether its

assertions were true or false or ADM made the assertions reckless to whether they were true or false.

210. The contracts and grants identified above were obtained by misrepresentations material the government's choice to pay on those contracts and claims as well as to ADM's failure to repay the funds under § 3729(g).

211. The misrepresentations were material for the reasons detailed in the complaint.

212. The Government has suffered actual damages as a result of ADM's false claims.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

a. a judgment against ADM in an amount equal to treble the damages the Government has sustained because of ADM's actions, plus a civil penalty of not less than $14,308 and not more than $28,619 per violation, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990;

b. a judgment that relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

c. a judgment awarding Relator and his attorneys and the Government all costs of this action, including attorneys' fees and expenses; and

d. any and all other relief as the Court may deem equitable and just under the circumstances.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands trial by jury on all claims and issues so triable.

DATED: September 23, 2026

Respectfully submitted,

*/s/ John F. Summers*
John F. Summers (admitted *pro hac vice*)
Texas Bar No. 24079417
Email: jsummers@caldwellcc.com
**CALDWELL CASSADY CURRY P.C.**
2121 N. Pearl St., Suite 1200
Dallas, Texas 75201
Telephone: (214) 888-4848
Facsimile: (214) 888-4849

Rachel Veronica Rose (admitted *pro hac vice*)
Texas Bar No. 24074982
**Rachel V. Rose – Attorney at Law, PLLC**
P.O. Box 22718
Houston, Texas 77227
Telephone: (713) 907-7442

David J. Chizewer (admitted in N.D. Ill.)
Email: david.chizewer@goldbergkohn.com
**Goldberg Kohn Ltd.**
55 East Monroe, Suite 3300
Chicago, IL 60603
Telephone: (312) 201-4000

**ATTORNEYS FOR RELATOR MARK PANNEK**